IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**JONATHAN HUEY LAWRENCE,**

　　　　**Petitioner,**

**vs.**　　　　　　　　　　　　**Case No.: 3:08cv69/SPM**

**WALTER A. McNEIL, Secretary,**
**Florida Department of Corrections,**
**et. al,**

　　　　**Respondents.**
_____/

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

　　　　**THIS CAUSE is before the court on a petition for a writ of habeas corpus filed by Jonathan Huey Lawrence, a Florida death row inmate, pursuant to Title 28, United States Code, Section 2254 (doc. 1).  Petitioner has asserted nine claims for relief. Respondents have filed an answer (doc. 6), and Petitioner has filed a reply (doc. 9). After careful consideration of the issues raised in the pleadings and for the reasons stated below, the petition is denied.**

## I.  FACTS & PROCEDURAL HISTORY

　　　　**The relevant facts are set out as follows in the Florida Supreme Court's opinion affirming Petitioner's conviction and sentence on direct appeal:**

> **On March 24, 2000, Lawrence pled guilty to principal to first-degree murder of Jennifer Robinson, conspiracy to commit first-degree murder, giving alcoholic beverages to a person under twenty-one, and abuse of a dead human corpse. Lawrence's codefendant, Jeremiah Martel Rodgers, picked up eighteen-year-old Jennifer Robinson from her mother's home on May 7, 1998. Rodgers and Robinson met Lawrence, and all three drove in Lawrence's truck to a secluded area in the woods. After imbibing alcoholic beverages, Robinson had sex with Rodgers and then with Lawrence. At some point thereafter,**

Rodgers shot Robinson in the back of the head using Lawrence's Lorcin .380 handgun.FN1 The gunshot rendered Robinson instantly unconscious, and she died minutes later. Lawrence and Rodgers loaded Robinson's body into Lawrence's truck and drove further into the woods. Lawrence made an incision into Robinson's leg and removed her calf muscle. Rodgers took Polaroid pictures of the body, including a picture of Lawrence's hand holding Robinson's foot. Lawrence and Rodgers buried Robinson at that site.

> FN1. The trial court below accepted, and the State did not attempt to refute, Lawrence's assertion that Rodgers actually killed Robinson by shooting her in the back of the head. On November 21, 2000, Rodgers was sentenced to death in a separate proceeding for being a principal to the first-degree murder of Robinson.

Investigators traced Robinson's disappearance to Lawrence and Rodgers. When confronted by Investigator Todd Hand, Lawrence denied knowing Robinson and consented to Hand's request to search Lawrence's trailer and truck. After recovering multiple notes written by Lawrence and Polaroid photographs depicting Robinson post-mortem, Hand arrested Lawrence. One page of the recovered notes states in part: "get her very drunk," "yell in her ears to check consicouse [sic]," "even slap hard," "[r]ape many, many, many times," " 'slice and dice,' [d]isect [sic] completely," "bag up eatabile [sic] meats," and "bag remains and bury and burn." Another page of notes provides a list of items and tasks, some of which had been checked off or scribbled out. That list includes "coolers of ice = for new meat," strawberry wine, everclear alcohol, scalpels, Polaroid film, and ".380 or-and bowies [knives]." Other items located by investigators during their search of Lawrence's trailer and truck included a box for a Lorcin .380 handgun; empty Polaroid film packages; a piece of human tissue in Lawrence's freezer; a blue and white ice chest; an empty plastic ice bag; disposable gloves; a scrapbook; and several books, including an anatomy book entitled The Incredible Machine, within which had been marked female anatomy pages and pen lines drawn at the calf section of a leg. Lawrence subsequently confessed to his involvement, after waiving his *Miranda*FN2 rights, and led detectives to Robinson's body.

> FN2. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed.2d 694 (1966).

At Lawrence's penalty phase before a jury, the State introduced evidence of Lawrence's prior violent crimes FN3 and argued that the murder was committed in a cold, calculated, and premeditated manner (CCP). The State also introduced Lawrence's tape-recorded confession. Lawrence called witnesses who testified about Lawrence's disturbed childhood and his mental capacity. FN4 The jury recommended death by a vote of eleven to one.

> FN3. The trial court's sentencing order details the facts of Lawrence's prior violent crimes:
>
> On June 17, 1999, [Lawrence] pled guilty in Federal Court to the capital felony crime of Murder in *United States v. Lawrence*, Case Number 3:98CR00073-001....
> On April 9, 1998, Rodgers, Jonathan Lawrence and Lawrence's cousin, Justin Livingston, were all at Lawrence's trailer. The three men left the trailer in Lawrence's truck to ride around. According to Lawrence, Rodgers induced Livingston to ride with them under the pretense of smoking marijuana. After arriving at a remote location, the men exited the vehicle. Both Lawrence and Rodgers surreptitiously retrieved knives from the toolbox of the Defendant's truck. Lawrence stated that Rodgers first stabbed the victim twice in the chest area and then attempted to strangle him. While Justin Livingston lay facedown, wounded and pleading for mercy, his cousin, Jonathan Lawrence, stabbed him in the back at least four times. Lawrence and Rodgers loaded the body in his truck and buried it at another location.
> Secondly, on March 27, 2000, [Lawrence] entered a plea of nolo contendere before this Court to an earlier crime of Principal to First Degree Attempted Murder. This Court adjudicated [Lawrence] guilty in *State v. Lawrence*, Case Number 98-321. On March 29, 1998 (eleven days before the murder of Justin Livingston) the elderly victim in this case, Layton [sic] Smitherman, was shot in the back while quietly sitting in his living room chair watching the evening movie with his wife and adult daughter. Mr. Smitherman did not know either defendant or of any grudge or dispute they might have with him. The bullet casing found outside the Smitherman residence was fired

from the Defendant's Lorcin 380 handgun later used to kill Jennifer Robinson. The Defendant admitted to law enforcement that both Jeremiah Rodgers and he had been driving around that evening looking to get into trouble, preferably to find somebody to shoot and kill. The Defendant drove his truck by the Smitherman home. They had found their target. Lawrence pulled the truck off to a secluded side of the Smitherman property. According to Lawrence, Rodgers exited the truck and shot Mr. Smitherman through a window. Rodgers returned to the truck and Lawrence drove away.

*State v. Lawrence*, No. 98-270-CFA at 2-3 (Fla. 1st Cir. Ct. order filed Aug. 15, 2000).

FN4. Lawrence called fourteen witnesses, including three experts, who testified extensively regarding Lawrence's background. Witnesses testified that Lawrence was slow and withdrawn and that his father's conviction and subsequent imprisonment for the sexual battery of Lawrence's twelve-year old half-sister furthered Lawrence's withdrawal. Testimony further revealed that Lawrence attempted suicide while in prison for a property offense and was thereafter committed to the state mental hospital in Chattahoochee until his sentence was served. The experts testified that Lawrence had organic brain damage and schizophrenia. Two of the three experts also testified that both statutory mental mitigators applied and that Lawrence could be considered a follower.

The trial court accepted additional evidence and testimony at the Spencer hearing FN5 and then followed the jury's recommendation and imposed a death sentence. The trial court found two aggravating circumstances: (1) Lawrence was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (great weight); and (2) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (great weight).FN6 The trial court found five statutory mitigating circumstances: (1) the capital felony was committed while Lawrence was under the influence of extreme mental or emotional disturbance (considerable weight); (2) the capacity of Lawrence to appreciate the criminality of his conduct or to

conform his conduct to the requirements of law was substantially impaired (considerable weight); (3) the age of Lawrence (twenty-three years) at the time of the crime (some weight); (4) Lawrence's caring and giving relationship to his family, especially his mother, (little weight); and (5) the sick and disturbed home life in which Lawrence was raised (considerable weight).FN7 The trial court also found four nonstatutory mitigating circumstances.FN8 See State v. Lawrence, No. 98-270-CFA (Fla. 1st Cir. Ct. order filed Aug. 15, 2000) (hereinafter sentencing order).

FN5. *See Spencer v. State*, 615 So.2d 688 (Fla.1993). At the *Spencer* hearing, the State introduced the scrapbook and books found in Lawrence's trailer and truck. The scrapbook included Lawrence's karate certificate, his high school diploma, references to serial killers, and a certificate of "Citizenship" in the Ku Klux Klan. The books included The Human Machine; The Anarchist Cookbook; Serial Killers; The Ultimate Sniper: An Advanced Training Manual For Military & Police Snipers; and Silencers, Snipers & Assassins: An Overview of Whispering Death. Lawrence testified and made an apology to the family of Robinson.

FN6. In support of this aggravating circumstance, the trial court stated:

   [T]he notes written by [Lawrence] reveal that he played an integral role in the calm, careful planning or prearranged designing of Jennifer Robinson's murder. The notes expose a detailed, preconceived plan to murder and mutilate a woman and the items they would use to carry out the plan....
   ....
Lawrence and Rodgers essentially followed their plan. First, they got Jennifer Robinson drunk. She was intoxicated when they had sex with her prior to the shooting.... Second, they both had sexual intercourse with her prior to her death. Third, Lawrence removed her calf muscle. He even held the dissected leg up for the codefendant to take pictures. A subsequent search revealed that a muscle was in a plastic bag in his freezer. The medical examiner testified that the shape and the area

of the cuts on that muscle were consistent with having been removed from the victim's lower leg. Fourth, Jennifer Robinson's body was found buried in a shallow grave.

....

The actions of [Lawrence], viewed in conjunction with the list of items needed to carry out the murder/mutilation and the description of the methodology to be used, demonstrate that he was an active participant in the murder plot and not a passive follower or observer. Furthermore, the remarkable similarity between several of [Lawrence's] actions and the details of his notes discredit his attempts to minimize his involvement in the murder. Based on the evidence presented the State established beyond every reasonable doubt that [Lawrence] along with the codefendant planned this senseless and gruesome murder over a considerable time and later executed the murder according to their plan. As stated earlier, they jointly planned this murder in detail, selected an unsuspecting victim and carried out their plan to get her drunk, have sex with her, kill her, dissect her body, take some of "the meat" home and bury her body. This was a senseless, merciless murder. It was concocted and carried out with absolutely no moral or legal justification.

Although Lawrence may not have been the actual shooter, this aggravator still applies because the evidence conclusively demonstrates that the crime was a joint operation that was planned and executed in a cold, calculated, and premeditated manner.

Sentencing order at 5-8.

FN7. Mitigating circumstances (4) and (5) were listed as non-specified statutory mitigating circumstances under section 921.141(6)(h), Florida Statutes (1997). The trial court found that the greater weight of the evidence did not establish that Lawrence acted under extreme duress or under the substantial domination of another person. *See* Sentencing Order at 16.

FN8. The nonstatutory mitigating circumstances were: (1) Lawrence's extreme remorse (little weight); (2) Lawrence's

leading law enforcement to the scene of the crime and to the body (some weight); (3) the offer of Lawrence to testify against the codefendant in exchange for a life sentence (little weight); and (4) Lawrence's model behavior as an inmate (little weight).

Regarding the statutory mental mitigators, the trial court found:

[Lawrence] presented the testimony of three experts: Dr. Frank Wood, a neuropsychologist, Dr. Barry Crown, a licensed psychologist, and Dr. Robert Napier, a licensed psychologist.

....

The uncontroverted expert opinions along with other evidence in the record demonstrate that [Lawrence] has organic brain damage and a substantial history of mental health problems. He does suffer from a mental or emotional disturbance and was under the influence of this disturbance at the time of this crime. This mental or emotional disturbance influenced Lawrence or his behavior during the criminal episode. However, the entirety of the evidence diminishes the substantiality of the influence. *See Foster v. State*, 679 So.2d 747, 755 (Fla.1996) (stating "[e]ven uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in this case.") (citing *Wuornos v. State*, 644 So.2d 1000, 1010 (Fla.1994)).[n.]

[n.]7. When the entire evidence presented is viewed in toto, this Court is convinced Lawrence's capacity to appreciate the criminality of his conduct or his ability to conform his conduct to the requirements of the law was impaired, but seriously questions if the impairment was relatively substantial. Lawrence obviously has both cognitive and volitional deficiencies. He is mentally and emotionally disturbed. Nonetheless, he clearly has the ability to appreciate the criminality of his conduct and, when he decides to do so, conforms his conduct to the

requirements of the law. As brought out in Dr. Wood's testimony, the vast majority of people who suffer schizophrenia do not commit murder and those who do often suffer hallucinations or delusions not competently evidenced in this case. There was no competent, substantial evidence [that Lawrence] experienced delusional thinking or perceptual disturbances.... In sum, Lawrence's criminality appears to be more substantively a product of his intrinsic or moral makeup (i.e., his character, his values, the "habits of his heart" to use the phraseology of Alex De Touqville) than the result of an overriding mental or emotional impairment.

....

To summarize, Lawrence was able to establish the existence of these two mental mitigators. He was under the influence of extreme mental or emotional disturbance. However, he failed to establish that any auditory hallucinations had any causal relationship with this crime nor was there any evidence of delusional thinking. Thus, the influence of his mental disturbance was significant but not predominant. Likewise, Lawrence's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, but this impairment was not a predominant factor. Despite the presence of both mental mitigators, there is not a predominant causal connection or relationship between Lawrence's mental or emotional disturbances and this senseless murder. Lawrence faced these mental issues on a daily basis for years. Despite his mental disturbance, Lawrence was somewhat self-sufficient and capable of loving those he chose to love. Though significantly impaired, he had the ability to appreciate the criminality of his conduct and to conform his conduct to these requirements of law.

Sentencing order at 9-10, 12-13 (some alterations in original) (footnote omitted).

*Lawrence v. State*, 846 So.2d 440, 442-46 (Fla. 2003)(per curiam), cert. denied,

*Lawrence v. Florida*, 540 U.S. 952, 124 S. Ct. 394, 157 L. Ed. 2d 286 (2003)("*Lawrence*

*I*').  **Petitioner raised seven claims on direct appeal.**[1]   **The Florida Supreme Court found no error and affirmed Petitioner's sentence of death.  Thereafter, Petitioner filed a motion for postconviction relief, asserting nine claims for relief.**[2] **After an evidentiary hearing, the postconviction court denied relief, and the Florida Supreme Court affirmed this denial.  *See Lawrence v. State*, 969 So.2d 294 (Fla. 2007)(per curiam)("*Lawrence II*").**

Petitioner filed the instant petition on February 20, 2008.  Doc. 1.  The petition is now ripe for adjudication.

## II.  EVIDENTIARY HEARING

Petitioner requests a plenary evidentiary hearing on the claims presented in his petition.[3]   Doc. 1 at 2.  Title 28 of the United States Code, Section  2254 provides for  an  evidentiary  hearing  in  federal  habeas  claims  under  very  limited circumstances:

(2) If the applicant has failed to develop the factual basis of a claim in

---

[1]Petitioner raised the following claims on direct appeal of his conviction and sentence: (1) the trial court erred by failing to order a competency hearing; (2) the trial court erred by refusing to admit into evidence facts in support of the substantial domination mitigator and then rejecting that mitigator; (3) the trial court erred by finding the cold, calculated, and premeditated aggravator; (4) the trial court erred by issuing a defective and unreliable sentencing order; (5) Florida's capital sentencing scheme is unconstitutional; (6) the trial court erred in allowing a lay witness to testify to an opinion reserved for experts (raised in supplemental briefing); and (7) his death sentence is disproportionate.  *See  Lawrence v. State*, 846 So.2d 440 (Fla. 2003)("*Lawrence I*").

[2]Petitioner raised the following claims in his motion for postconviction relief:  (1) his constitutional rights were violated because his guilty plea was not knowing and voluntary; (2) his convictions and death sentence are unreliable because no adversarial testing occurred during the pretrial and guilt-phase proceedings due to the ineffective assistance of his counsel; (3) his sentence is unreliable because inadequate testing occurred during the penalty phase due to ineffective assistance of counsel; (4) the Florida death penalty sentencing statute is unconstitutional as applied; (5) his constitutional rights were violated because he was denied the opportunity to interview jurors; (6) execution by electrocution or lethal injection is cruel or unusual punishment; (7) he may be incompetent at the time of execution; and (8) the cumulative effect of the procedural and substantive errors deprived him of a fundamentally fair trial. Petitioner later amended his motion, raising the additional claim that counsel was ineffective for failing to request a competency hearing during the penalty phase.  *See Lawrence v. State*, 969 So.2d 294 (Fla. 2007)("*Lawrence II*").

[3]Petitioner was granted an evidentiary hearing in state court.

State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

> (A) the claim relies on--
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(2002). Under Section 2254(e) a hearing is not warranted "if such a hearing would not assist in the resolution of [the] claim." *See Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002) (citation omitted). In *Schriro v. Landrigan*, 550 U.S. 465, 474-75, 127 S. Ct. 1933, 1940, 167 L. Ed. 2d 836 (2007), the Court explained:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. *See, e.g., Mayes v. Gibson*, 210 F.3d 1284, 1287 (C.A.10 2000). Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. *See id.*, at 1287-1288 ("Whether [an applicant's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]").
>
> * * * *
>
> This principle accords with AEDPA's acknowledged purpose of "reduc[ing] delays in the execution of state and federal criminal sentences." *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003) (citing *Williams v. Taylor, supra*, [529 U.S. 362] at 386, 120 S. Ct. 1495 (opinion of STEVENS, J.) ("Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law")). If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district

courts would be forced to reopen factual disputes that were conclusively resolved in the state courts.

(footnote omitted). Petitioner has not presented or proffered any evidence to this court which would necessitate an evidentiary hearing on any of the claims he has raised. See *Ojeda v. Sec.'y for Dep't. of Corrs.,* 279 Fed. Appx. 953, 954 n.1 (11th Cir. 2008)(per curiam)(evidentiary hearing is unnecessary where trial transcripts sufficiently address an issue, and a hearing would not have added any new information*). See also Kelley v. Sec.'y for Dep't of Corrs.*, 377 F.3d 1317, 1334-37 (11th Cir. 2004)(capital petitioner met none of the requirements contained in 28 U.S.C. § 2254(e)(2), thus district court abused discretion in granting evidentiary hearing). Because Petitioner has not met the requirements for an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2), his request for an evidentiary hearing will be denied.

### III. STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding.

**28 U.S.C.A. § 2254 (2002).**

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[4]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); *Ramdass v. Angelone*, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  The Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.

---

[4]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds* by *Parker v. Head*, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting *Williams*, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If, on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must proceed to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S.

685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  The State court's incorrect or erroneous application of clearly established law may be found reasonable, and not warranting a writ, so long as the State court adjudication results in a "satisfactory conclusion." *Williams*, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).  When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see e.g. Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); *Jones v. Walker*, 496 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by

clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); *Jones*, 496 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). Finally, in the event that constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U. S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but are not entitled to habeas relief based on trial error unless they can establish 'actual prejudice.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U. S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)).[5]

Within this framework, the court will review Petitioner's claims.

## IV. PETITIONER'S CLAIMS

**Ground I:** Failure of Trial Court to Appoint Mental Health Experts and Order a Competency Hearing

Petitioner alleges that the trial court was constitutionally required to order a competency hearing despite his attorneys' failure to request one in light of Petitioner reporting to his attorneys that he was experiencing hallucinations and flashbacks during certain portions of the penalty phase testimony. Doc. 1 at 30-42.

### 1. State Court Proceedings

---

[5]This harmless error standard is also applicable to cases involving habeas challenges to death sentences. *See Calderon v. Coleman*, 525 U.S. 141, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998); *Duest v. Singletary*, 997 F.2d 1336 (11th Cir. 1993); *Hicks v. Head*, 333 F.3d 1280 (11th Cir. 2003).

Petitioner raised this issue in the direct appeal of his conviction and sentence.

The Florida Supreme Court denied relief, holding as follows:

> Lawrence claims that the trial court erred by failing to appoint mental health experts and order an evidentiary competency hearing during the trial. While a State witness was explaining photographs depicting the discovery of Robinson's body, Lawrence's attorney informed the trial court that Lawrence reported having hallucinations and flashbacks. After a break, Lawrence's counsel indicated that Lawrence was prepared to proceed, and the penalty phase resumed. Subsequently, during the playing of one of Lawrence's recorded statements, Lawrence's counsel again informed the trial court that Lawrence indicated he was experiencing hallucinations. The trial court took a break, engaged in a colloquy with Lawrence, and allowed Lawrence to leave the courtroom while his recorded statements were played. No competency hearing was requested. Lawrence asserts in this appeal that the trial court was constitutionally required to order an evidentiary hearing.
>
> Decisions regarding competency, including whether a defendant need be given a competency hearing after previously being declared competent to proceed, are within the sound discretion of the trial court. *See Bryant v. State*, 785 So.2d 422, 427 (Fla.2001); *Hunter v. State*, 660 So.2d 244, 248 (Fla.1995) ("Once a defendant is declared competent ... only if bona fide doubt is raised as to a defendant's mental capacity is the court required to conduct another competency proceeding."). A trial court's decision regarding whether to hold a competency hearing will be upheld absent an abuse of discretion. *See Hunter*, 660 So.2d at 247.FN10 In the instant case, the trial court did not abuse its discretion by not conducting a competency hearing during the penalty phase.
>
>> FN10. Lawrence asks this Court to recede from its cases which hold that a trial court's decision regarding whether to grant additional competency hearings is reviewed for abuse of discretion. We decline to do so. We continue to conclude that the trial judge's resolution of the ongoing mental status of the defendant involves a credibility determination and observations of the defendant in the courtroom. These are decisions that a trial judge must make.
>
> Prior to trial, Lawrence's counsel made several motions to appoint

experts to evaluate Lawrence for competency to stand trial. The trial court granted the motions. Those experts did not, however, evaluate Lawrence, because Lawrence decided to offer the guilty plea. Prior to the plea colloquy, the trial court asked Lawrence's counsel, "Are you satisfied that given [Lawrence's] current mental situation and any psychological issues there may be that he understands the very serious nature and consequences of this decision [to plead guilty]?" Lawrence's counsel answered:

> Yes, judge. We addressed that in our private consultation with him on the video. And I inquired of him if he was having any hallucinations, either auditory or visual, and having anything to do with his decision to enter a plea of guilty. And he did not. He is not on any medication.
>
> We do recognize that our mitigation will establish that there is some problem with his judgment and his ability to reason and think. But we think that he has the capacity to appreciate the effect of his guilty plea upon the penalty phase of the proceeding.

Lawrence's counsel further stated, "We'll point out that [Lawrence] was evaluated sometime back by Dr. Larson and Dr. Bingham and found competent to proceed." The trial court then engaged Lawrence in an extensive plea colloquy, wherein Lawrence answered the court's questions and informed the court that the decision to plead guilty was his decision.

When Lawrence later displayed signs of discomfort in the courtroom, the trial court stopped the proceedings and discussed the matter with both Lawrence's counsel and Lawrence. Lawrence's counsel never requested a competency hearing during the penalty phase and gave all indications that Lawrence was competent to stand trial. *Cf. Kilgore v. State*, 688 So.2d 895, 899 (Fla.1996) (finding trial court did not err by not holding competency hearing where defense counsel did not request a hearing and defendant had previously been declared competent). The trial judge then thoroughly questioned Lawrence about the nature of the hallucinations and flashbacks. After speaking with Lawrence, the trial court determined that Lawrence was simply uncomfortable hearing certain portions of the evidence. Lawrence has failed to demonstrate that, under these circumstances, the trial court abused its discretion by proceeding with the penalty phase without giving Lawrence a

competency hearing.

*Lawrence I*, 846 So.2d at 446-48.

2.      **Clearly Established Supreme Court Law**

The Due Process Clause of the Fourteenth Amendment prohibits states from trying or convicting a defendant who is mentally incompetent. *See Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). The Supreme Court has set the standard to be used in determining mental competency as whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding–and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)(per curiam) and *Drope v. Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). *See also Indiana v. Edwards*, 554 U.S. 164, 128 S. Ct. 2379, 2383, 171 L. Ed. 2d 345 (2008).

In *Drope*, the Court elaborated as follows:

[t]he import of our decision in *Pate v. Robinson* is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

*Drope*, 420 U.S. at 180.

The Eleventh Circuit Court of Appeals has applied and expounded upon these standards. "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995)(citation omitted). A *Pate* analysis must focus on "what the trial court did in light of what it then knew, whether objective facts known to the trial court were sufficient to raise a bona fide doubt as

to the defendant's competency." *Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir. 1987).

A petitioner who makes a substantive competency claim, contending that he was tried and convicted while mentally incompetent, "is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." *James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992). This standard is in contrast to a petitioner who makes a procedural competency claim alleging that the trial court failed to hold a competency hearing after his competency was put at issue. To prevail on a procedural competency claim, "a petitioner must establish that the state trial judge ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial." *Id*. at 1572 n.15 (citing *Fallada*, 819 F.2d at 1568). A petitioner who presents "clear and convincing evidence" which creates a "real, substantial and legitimate doubt" as to his competence is entitled to an evidentiary hearing on his substantive competency claim. *Medina*, 59 F.3d at 1106 (quoting *James*, 957 F.2d at 1573). However, the standard of proof is high, and "the facts must positively, unequivocally, and clearly generate the legitimate doubt." *Card v. Singletary*, 981 F.2d 481, 484 (11th Cir. 1992)(quotations omitted). Relevant information may include evidence of a defendant's irrational behavior, demeanor at trial, or prior medical opinion. *Watts v. Singletary*, 87 F.3d 1282, 1287 (11th Cir. 1996). Furthermore, because legal competency is primarily a function of defendant's role in assisting counsel in conducting the defense, the defendant's attorney is in the best position to determine whether the defendant's competency is suspect, so "the failure of defense counsel to raise the competency issue at trial, while not dispositive, is evidence that the defendant's competency was not really in doubt and there was no need for a *Pate* hearing." *Id*. at 1288. *See Adams v. Wainwright*, 764 F.2d 1356, 1360 (11th Cir.1985).

"A presumption of correctness attaches to a state court's finding of competence and a federal habeas court must determine that the finding is not 'fairly

supported by the record' before it may overturn a state courts' decision." *Medina*, 59 F.3d at 1106 (quoting *Maggio v. Fulford*, 462 U.S. 111, 117, 103 S. Ct. 2261, 2264, 76 L. Ed. 2d 794 (1983)); *see Card*, 981 F.2d at 484 n.5 (citing *Demosthenes v. Baal*, 495 U.S. 731, 110 S. Ct. 2223, 109 L. Ed. 2d 762 (1990)); *see also* 28 U.S.C. § 2254(d). A district court's determination that there is insufficient evidence to generate a "substantial and legitimate doubt" as to the petitioner's competence is reviewed for clear error. *Card*, 981 F.2d at 483-84.

      3.    **Federal Review of Claim**

In his first ground for habeas relief, Petitioner is raising a procedural competency claim. Thus, the standard is whether the trial judge ignored facts which raised a 'bona fide doubt' regarding his competency to stand trial. The record reflects that during the penalty phase testimony of Janice Johnston, a crime scene analyst with the Florida Department of Law Enforcement who was testifying about the scene where the victim's body was found, defense attorney Antoinette Stitt advised the trial court that Petitioner had just reported "having hallucinations and flashbacks." Trial Record ("T.") Vol. IV at 419. The court then took a 15 minute recess, during which time a court security officer whom Petitioner liked spoke with him. *Id.* After the break, the court asked Petitioner how he was doing, and Petitioner responded that he was okay to proceed. *Id.* at 420. Ms. Stitt also confirmed that Petitioner was ready to proceed. *Id.*

Later, during the testimony of Detective Joe McCurdy, a tape-recorded confession was played for the jury involving a prior murder committed by Petitioner and his co-defendant in the Robinson murder, Jeremiah Rodgers, in May of 1998 (the victim was Justin Livingston). During the playing of this tape, Ms. Stitt again advised the court that Petitioner indicated to her that "he is beginning to hallucinate again and he would like to be excused for the playing of the tapes." *Id.* at 464. The court then recessed to explore what was happening to Petitioner. The court asked Petitioner if he understood his constitutional right to be present, and he responded

that he understood. *Id*. The following exchange then occurred:

[Court]: And your counsel has used the word "hallucination," but what we are actually talking about is flashbacks, remembering what happened?

[Defendant]: Yes.

[Court]: Is that what is bothering you?

[Defendant]: Yes, sir. It is bothering me pretty bad.

[Court]: And counsel discussed this with him and his right to be present?

[Stitt]: Yes.

[Court]: And, Mr. Lawrence, you wish to just remove yourself for the period of the tape being played?

[Defendant]: Yes.

[Defense attorney Killam]: Both of his statements. And he wants to be absent.

[Court]: Is that true, Mr. Lawrence, you wish to be absent for the playing of the tape regarding Justin Livingston, and the second tape is the description of the incident with Jennifer Robinson.

[State attorney Molchan]: Yes, sir.

[Court]: Is that what you wish to do?

[Defendant]: Yes, sir.

[Court]: And both counsel agree with that decision?

[Stitt]: Yes.

[Killam]: Yes.

*Id.* at 465-66.  Assistant State Attorney Ronald Swanson then stated that the State did not have an objection and noted that Ms. Stitt and Mr. Killam had assured him that the issue was one of discomfort, not competency.  *Id.* at 466.  The court then had Petitioner clarify his feelings for the record.  The following exchange occurred when the court asked Petitioner to describe what was going on:

[Defendant]: Mainly rather not be here when they hear, I guess my own voice on there.

[Stitt]: Tell me what you told me about it being the voice of your brother.

[Defendant]: I'd just rather not hear it.

[Stitt]: Just a minute ago you told me that you were hearing the voice of your brother, your dead brother.

[Defendant]: That's what the tape sounds like.  And I just don't want to hear it.

[Stitt]: And did you say anything to me about having visual hallucinations?

[Defendant]: When I was back out in the field and I don't want to be out there.

[Court]: So what you are remembering is actually the event?

**[Defendant]: Yes.**

**[Court]: What happened that night?**

**[Defendant]: Yes.**

**[Court]: As you are listening to your voice and it is being played you are reliving it in your mind, is that what you are talking about?**

**[Defendant]: Yes.**

**[Court]: But is it a true picture in your mind of what happened, is it just like a replay?**

**[Defendant]: Yes, sir.  It is–it makes me real nervous and makes me sweat real bad.**

**[Court]: But you are not hearing other people's voices or things that are not replaying?  I am trying to distinguish between your replaying in your mind what happened in the past as opposed to real strange things going on?**

**[Defendant]: I can't really explain it.**

**[Court]:  Is it a replay of what happened?  Is that what is troubling you or are you hearing other voices or–**

**[Defendant]: I don't know for sure.**

**[Court]: Only you can tell me.**

**[Defendant]:  –I'm not real sure what to think, I guess that I could go sit back down or something–**

[Stitt]: You just want to be excused?


[Defendant]: Yes, ma'am.


[Stitt]: Okay.


[Court]: And it's because you are uncomfortable hearing yourself describe what happened, is that the reason?


[Defendant]: Yes.


[Court]: Is there any other reason other than you are just uncomfortable listening to yourself describe, describe what you did, is that the reason?


[Defendant]: (Nods head affirmative) I think so.


[Court]: Anything else?  Or is that the reason?


[Defendant]: I guess that's it.


[Court]: Okay.  I'll allow you to step out and find that you have freely, and voluntarily, and knowingly waived your right to be present during the presentation.

*Id*. at 467-69.  The following day, prior to playing the second taped confession regarding the murder of Ms. Robinson, the court again inquired if Petitioner wished to be absent from the courtroom when the tape was played for the jury.  The court asked Petitioner if he was hearing any noises or anything in his head, and he responded that he was not.  *Id.* at 503.  Petitioner then reiterated his desire to leave the courtroom during the playing of the tape.  The court again asked why, and the following exchange took place:

[Court]: And can you tell me why?

[Defendant]: I guess I just have a hard time hearing myself talk.

[Court]: It makes you uncomfortable listening–

[Defendant]: Yes, sir.

[Court]: –listening to what you said?

[Defendant]: Yes, sir.

[Court]: Any other reason?

[Defendant]: I'm not really sure.  I can't really explain it.

[Court]: Okay.  I'm going to–Ms. Stitt, you're satisfi[ied] that–

[Stitt]: Yes, sir.

[Court]:–this is in your client's best interest?

[Stitt]: Yes, sir.

*Id*. at 504.

The Florida Supreme Court found that Petitioner failed to demonstrate that the trial court abused its discretion by proceeding with the penalty phase without ordering a competency hearing.  A review of the record supports this determination. While Petitioner complained of hallucinations, when questioned by the court it appeared that his actual problem stemmed from his discomfort in listening to his confessions to two murders in which he was involved.  The record reflects that

Petitioner understand the court's questions and responded appropriately to them. Additionally, Petitioner's attorneys did not raise the issue of his competence nor ask that an evaluation be made based on any behavior that they observed–an important factor in analyzing claims of this type–and there is no indication that Petitioner was unable to assist in his defense. *See Pate, Watts v. Singletary, supra.* Finally, there is no record evidence of any irrational behavior or other troubling demeanor before or after the playing of the tapes nor is there any evidence of any similar problems throughout the course of the trial. When the issue of flashbacks arose, the court made a thorough attempt to determine the cause of Petitioner's problems and satisfied itself that Petitioner understood his right to be present and voluntarily waived his presence. Given these considerations, this court is satisfied that there were not facts before the court sufficient to raise a bona fide doubt as to the defendant's competency.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground II:    Ineffective Assistance of Counsel in Failing to Request a Competency Hearing**

Petitioner alleges that he received ineffective assistance of counsel when his defense attorneys failed to request a competency hearing based on his reports of hallucinating during portions of the trial. Doc. 1 at 42-53.

1.      State Court Proceedings

Petitioner raised this issue in his motion for postconviction relief, and the postconviction court denied the claim.  The Florida Supreme Court affirmed, holding as follows:

> On direct appeal, Lawrence asserted that the trial judge erred because he failed to order a competency hearing after he learned about Lawrence's hallucinations. After noting that no competency hearing was requested, this Court denied the claim, particularly in light of the fact that defense counsel informed the trial court that some time before, Lawrence had been found competent to proceed, and they thought he was still competent to proceed. Of further importance to this Court was the fact that the trial court engaged in a lengthy colloquy with Lawrence and, based on his responses, found that "Lawrence was simply uncomfortable hearing certain portions of the evidence." *Lawrence*, 846 So.2d at 448. Accordingly, this Court denied the claim that the trial court abused its discretion in proceeding with the penalty phase without first ordering a competency hearing. *Id*.

> The State contends that because Lawrence already challenged the failure to hold a competency hearing, Lawrence's current claim is procedurally barred. We disagree. The only question that this Court faced on direct appeal was whether the trial court erred in failing to sua sponte order a competency evaluation. This is an entirely different legal question than whether defense counsel should have requested the hearing. Defense counsel has a different obligation to their client than the judge and has a much broader base of knowledge upon which to rely in determining whether a defendant may be incompetent. In this case, it is clear that in making his decision, the trial judge relied significantly upon counsel's representations and counsel's discussion with Lawrence as to whether Lawrence was truly experiencing hallucinations or flashbacks. In order to resolve such a claim, this Court would need evidence pertaining to what Lawrence's counsel knew, including what they learned from their mental health experts, whether Lawrence's behavior changed during their representation, conversations counsel had with their client, and numerous other factors which would not be apparent on the face of the record at that time. Accordingly, Lawrence could not have raised his current ineffective assistance of counsel claim on direct appeal. *See, e.g., Bruno v. State*, 807 So.2d 55, 63 n. 14 (Fla.2001) ("A claim of ineffectiveness can

properly be raised on direct appeal only if the record on its face demonstrates ineffectiveness."); *Desire v. State*, 928 So.2d 1256, 1257 (Fla. 3d DCA 2006) ("As a general rule, claims of ineffective assistance of counsel are not ordinarily cognizable on direct appeal. The exception is when the error is apparent on the face of the record, which is rarely the case.")

In turning to the merits of this case, the postconviction court denied this claim as follows:

> In the instant case, Mr. Killam testified that based on his conversations with the Defendant and his experience that the Defendant was not having a "competency problem; he was having a bout with his conscience." As such, Mr. Killam testified that based on his experience and what was observed during the penalty phase hearing he did not think the Defendant was incompetent thus there was no need for a competency evaluation. Ms. Stitt testified that after consultation with co-counsel it was determined that the Defendant was not hallucinating but he was experiencing flashbacks thus she did not request a competency hearing at that point. However, Ms. Stitt testified that in hindsight she would have requested a competency hearing.

> Hindsight analysis of what actions should have been taken is not the appropriate standard in determining deficiency, the question rests on what the circumstances were at the time that the particular decision was made. The decision not to seek a competency evaluation at the time of the alleged hallucination was based on counsels' interaction with the Defendant, as discussed previously, his demeanor remained constant throughout the representation, discussions with the Defendant following the alleged hallucinations, and approximately 50 years of combined litigation experience. Therefore, the Court finds counsels' decision not to request a competency hearing was based on reasoned professional judgment.

> Moreover, the Defendant has failed to establish that but for counsel's alleged deficient conduct there is a reasonable

probability the results would have differed. In fact, Justice Bell testified that having dealt with the Defendant in juvenile court and through the process he made the informed decision the Defendant was not hallucinating but disturbed by flashbacks of what happened during the victim's murder. Consequently, this claim is denied.

(Citations omitted.) While postconviction counsel has provided additional information, including Stitt's testimony that she was concerned about Lawrence's competency all along and that she regretted her decision not to request a competency hearing, such hindsight doubts are insufficient to show deficient performance. Lawrence has failed to show any error. A complete review of the record, including both the evidence shown at the evidentiary hearing and the testimony at trial show that it was difficult to determine whether Lawrence was truly experiencing hallucinations or whether he was bothered by the portions of the evidence which were being presented. Lawrence was asked directly about this, and his counsel consulted with him at the time he was reporting these problems. Stitt never stated that the reported hallucinations made her question Lawrence's competency. Instead, counsel asserted that Lawrence's behavior did not change from the initial time when two experts found him competent until the trial was completed. Although both Stitt and Killam had the opportunity to talk with their client immediately after the incidents, the postconviction evidentiary hearing did not reveal any additional information which would have compelled counsel to seek a competency hearing. Finally, Deputy Jarvis testified during the hearing as to his conversation with Lawrence immediately after Lawrence reported his problems. While Deputy Jarvis noted that Lawrence was more upset than he had ever seen him, Lawrence told him that he did not like hearing the tapes because it seemed like the crime was happening all over again-similar to statements that he made on the record to the judge. Based on the above, there is competent, substantial evidence to support the postconviction court's factual findings, and Lawrence has not shown that the trial court's conclusions of law are erroneous.

*Lawrence II*, 969 So.2d at 313-14.

2.    Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674

(1984). To obtain relief under *Strickland*, a habeas petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*, 466 U.S. at 687. It is the petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof. *Id.* If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574–1575, 71 L. Ed.2 d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana*, *supra*, 350 U.S. at 101, 76 S. Ct. at 164.

*Strickland*, 466 U.S. at 689.

As to the prejudice prong of the *Strickland* standard, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Strickland*, 466 U.S. at 693. The Court has also clarified, however, that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. *Strickland*, 466 U.S. at 693–94. Instead,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. Indeed, it would be "contrary to" the law clearly established in *Strickland* for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. *Williams v. Taylor, supra*, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Strickland*, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695–96.

### 3.  Federal Review of Claim

The Florida Supreme Court cited *Strickland* as the legal standard for analyzing claims of ineffective assistance of counsel and applied those standards to Petitioner's claims. *Lawrence II,* 969 So. 2d at 307. The court, therefore, applied the correct legal

rule based on Supreme Court precedent. Accordingly, the remaining issue is whether the state court's denial of Petitioner's claim resulted in an unreasonable application of *Strickland*.

At the evidentiary hearing, Elton Killam, co-counsel who was responsible for the penalty phase case, testified that he did not believe that Petitioner was having hallucinations when the first tape was being played, but was experiencing "bouts with his conscience." Evidentiary Hearing ("EH") Vol. II at 221. He did not question Petitioner's competency based on this event. *Id.* at 226. Mr. Killam, who had been a public defender for 31 years, explained, "I have seen this phenomena before in trials where defendants are hearing about things that they did and they don't want to hear it. And they–They had what I call 'bouts of conscience' where they are annoyed. They show visible signs of being irritated." *Id.* at 225-26.

Antoinette Stitt, lead counsel for Petitioner, testified at the evidentiary hearing that she felt from her first visit and throughout her representation that Petitioner was not competent. *Id.* at 259. She stated, "[w]hen we interviewed him, he kept his eyes (Indicating) to the floor. He was either nonresponsive to the questions or gave short answers." *Id.* at 260. She also explained that there did not seem to be any change in Petitioner's ability to communicate or in his demeanor throughout her representation of him. *Id.* Ms. Stitt testified that she did not request a competency hearing after consulting with Mr. Killam because he felt that Petitioner was experiencing flashbacks as opposed to hallucinations. *Id.* at 264. She regrets not requesting a competency hearing and would request one if she could make the decision again. *Id.*

On cross-examination, Ms. Stitt acknowledged that Dr. Bingham and Dr. Larson had previously concluded that Petitioner was competent to stand trial and that Petitioner's behavior remained pretty consistent from the time of these evaluations throughout her representation. *Id.* at 322. Ms. Stitt also testified that once Petitioner returned from the first recess after he began having problems, she did not believe that he was having any more hallucinations. *Id.* at 323.

Justice Kenneth Bell, who was the trial judge on the case, testified that if the defense attorneys had requested a competency hearing upon the notification of Petitioner's reports of hallucinations, he would have inquired a bit further to determine if a hearing were necessary.  *Id.* at 241-42.  When asked if he would have considered the reports of hallucinations, Justice Bell answered:

> Within the context and it being there and having dealt with Mr. Lawrence before in juvenile court, and having dealt with him throughout this process, and knowing the experience of his attorneys through all of that it was–I was trying to distinguish, as I did a little bit later, whether he was just being disturbed at remembering the event or what was going on as relayed in his statement or whether they were truly hallucinations.  And what I was trying to do is distinguish between whether it was truly hallucinations or whether it was just simply being disturbed by the flashbacks remembering what was going on.  And that was the distinction I ended up making, but that was the differentiation that I need to make.

> But if Toni Stitt or Mr. Killam had believed that he was truly having hallucinations and they were concerned about his competency, I certainly would have gone into that.  And if they both believed given their experience and relationship with him and their past experiences as capital attorneys, I would have definitely granted the request.

*Id.* at 242-43.  On cross-examination, the following exchange took place with regard to this issue:

> [Assistant State Attorney John Molchan]: And regarding the request for him in inquiring further about a competency evaluation, had you observed anything different about Jonathan Lawrence from your dealings with him in the past and during the course of this trial up to that episode that gave you any concern about whether or not he was having problems?

> [Bell]: No.  I hadn't observed anything different at all.

> [Molcan]: And during the course of this particular trial were there any complaints made by counsel afterwards that they were having any problems with communicating with Mr. Lawrence or that–or that his behavior was causing them problems in erecting or going to trial, or going

through the trial process?

[Bell]: None that I remember.

*Id.* at 253-54.

Officer John Jarvis, a detention deputy with the Santa Rosa Sheriff's Department, testified at the evidentiary hearing that he was assigned to transport Petitioner during the penalty phase of the trial. EH Vol. III at 462. Officer Jarvis testified that after Petitioner reported the hallucinations, he was with him during the brief recess. He stated that he knew Petitioner was upset and asked him about it. Petitioner told him that "he just didn't want to hear the tapes. It made it seem like it was happening all over again." *Id.* at 463.

The Florida Supreme Court found that there was competent, substantial evidence to support the postconviction court's factual findings that Petitioner had not established either prong of the *Strickland* standard. The supreme court acknowledged that based on the record it was difficult to determine whether Lawrence was truly experiencing hallucinations or whether he was bothered by the portions of the evidence which were being presented. However, the trial court attempted to make the distinction and neither counsel at the time indicated that they were concerned about Petitioner's competency. Additionally, the court found that both counsel and the trial court noted that Petitioner's behavior remain unchanged from the time of the competency evaluations in October of 1998 throughout the course of the trial. Finally, the evidentiary hearing did not reveal any additional information which would have compelled counsel to seek a competency hearing. *See Lawrence II*, 969 So.2d at 314.

The state court ratified the postconviction court's determination that the decision not to request a competency hearing was based on reasoned professional judgment. Petitioner has not presented sufficient evidence in his habeas petition to overcome the presumption of correctness accorded the findings of the state court. Furthermore,

defense counsel in this case were experienced. The postconviction court noted that Ms. Stitt had been a defense counsel for approximately twenty years (*see* EH Vol. II at 319) and Mr. Killam had thirty-one years of experience as a felony criminal defense attorney, including handling twenty-five capital cases (*see* EH Vol. I at 199). *See* Order Denying Defendant's Motion to Vacate Judgment and Sentence ("Postconviction Order"), Postconviction Record ("PCR") at 441. Because defense counsel were experienced trial attorneys, the presumption that their conduct was reasonable is strong. *See Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000)("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.") .

Finally, as the Court in *Strickland* noted, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. At the time of the reported hallucinations, Mr. Killam believed that Petitioner was suffering from bouts of conscience based on many years as a defense attorney and his experience with other defendants. While Ms. Stitt testified at the evidentiary hearing that she should have questioned Petitioner's competency at the time, during the trial she did not do so. Her later opinion is not significant when evaluating this claim. Because the standard is an objective one, the fact that trial counsel admits at a postconviction evidentiary hearing that his or her performance was deficient matters little. *See Tarver v. Hopper*, 169 F.3d 710, 716 (11th Cir.1999) (noting that "admissions of deficient performance are not significant"); *see also Atkins v. Singletary*, 965 F.2d 952, 960 (11th Cir.1992) ("[I]neffectiveness is a question which we must decide, [so] admissions of deficient performance by attorneys are not decisive."). *See gen., Chandler, supra*, 218 F.3d at 1316 n.16.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing

evidence. Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground III:** **Petitioner was Deprived of Substantive Due Process Because He Was Incompetent When He Entered His Plea and During Trial**

Petitioner contends that his Sixth and Fourteenth Amendment rights were violated because he was incompetent when he entered his plea and during his penalty phase trial. *See* doc. 1 at 53-70. Respondents allege that this substantive due process claim is procedurally barred from habeas review because it was not raised in either of Petitioner's state court proceedings. *See* doc. 6 at 67-72.

1.      **State Court Proceedings**

Petitioner did not raise a substantive due process competency claim in state court.

2.      **Clearly Established Supreme Court Law**

The law governing procedural and substantive due process competency claims is discussed *supra*. While Respondents correctly assert that Petitioner did not raise a substantive due process competency claim in state court, the law of this circuit is that such claims generally cannot be defaulted. *See Wright v. Secretary for Dept. of Corrections*, 278 F.3d 1245, 1258-59 (11th Cir. 2002); *Johnston v. Singletary*, 162 F.3d 630, 637 (11th Cir.1998); *Medina v. Singletary*, *supra*, 59 F.3d at 1107; *Adams v. Wainwright*, 764 F.2d 1356, 1359 (11th Cir.1985). Because there is no state court decision on the merits, this court will make a de novo review of this claim. However, because Petitioner raised a procedural competency claim and a related ineffective assistance of counsel claim in state court, there is some overlap between grounds

three, four and five, so the state court determinations to some extent are considered here.

### 3.    Federal Review of Claim

As set forth *supra*, in order to prevail on a substantive due process claim a petitioner must present clear and convincing evidence which creates a "real, substantial and legitimate doubt" as to his competency. *Medina*, 59 F.3d at 1106. The standard of proof is high and "the facts must positively, unequivocally, and clearly generate a legitimate doubt." *Card*, *supra*, 981 F.2d at 484. After careful consideration of the record, Petitioner has not met the high standard of proof necessary to prevail on a substantive due process claim. Petitioner has failed to create a legitimate and substantial doubt regarding his competency at the time that he entered his plea and stood trial.

While Petitioner had a history of mental illness, he had never been found incompetent. Significantly, he was a co-defendant in the Livingston murder and in the Smitherman attempted murder, both of which took place close in time to the Robinson murder. He entered a plea in both cases which were accepted by the respective trial courts without any reservations regarding his competency. In the case of the Livingston murder, Petitioner appeared before federal judge Roger Vinson and entered a plea of guilty to capital felony murder in June of 1999. *See Lawrence I*, 846 So.2d at 443 n.3. In the Smitherman murder, Petitioner appeared before Judge Bell and entered a plea of nolo contendere as a principal to a first-degree attempted murder on March 27, 2000. *Id*. Petitioner entered his plea in this case on March 24, 2000.

Also, while Petitioner's defense counsel initially filed motions to appoint experts to evaluate his competency earlier in this case, these evaluations did not occur because of the decision to enter a guilty plea. *See* T. Vol. I at 13 & 22. However, defense counsel was aware that Drs. James Larson and John Bingham examined Petitioner in 1998, and both found him competent. Additionally, although they met with Petitioner many times during their representation, defense counsel did not raise the issue of his

competency again and both testified that Petitioner's behavior and affect remained consistent throughout their lengthy interactions with him. Neither counsel testified that they could not communicate with him or that he was unable to assist in his defense. Petitioner likewise fails to present any evidence that he lacked the ability to communicate with counsel or assist them when necessary, a key component in considering this claim.

Furthermore, during the plea colloquy the trial court questioned both Ms. Stitt and Mr. Killam specifically raising the concern that Petitioner suffered from mental issues, and both attorneys advised the court that they believed Petitioner understood the nature of the charges and the consequences of the plea. The court also questioned Petitioner's mother who advised the court that she believed that Petitioner understood the plea and that the decision to enter it was his alone. The court then engaged in an extensive plea colloquy in which Petitioner responded appropriately. Finally, no evidence has been presented or found in the record that Petitioner misbehaved during the trial or was otherwise unable to assist in his defense. The episodes of his "hallucinations" have been addressed *supra* and do not raise a bona fide doubt as to Petitioner's competency at the time he entered his plea.

As far as medical testimony is concerned, Dr. Frank Wood, a neuropsychologist and PET scan imaging specialist, testified at the evidentiary hearing that he was consulted before trial by Petitioner's defense counsel to evaluate his mental status. EH Vol. I at 14. While Dr. Wood could not remember precisely, he thinks that he interviewed Petitioner the Sunday after Petitioner entered his plea on Friday, and he testified in the penalty phase of Petitioner's trial. *Id*. at 34. Dr. Wood diagnosed Petitioner as schizophrenic by the classic DSM-IV criteria. *Id*. at 21. Dr. Wood testified at the evidentiary hearing that given the reports of hallucinations at issue and his diagnosis of schizophrenia, Petitioner was not competent at the time he entered his plea. *Id*. at 26. He continued, "[t]he qualification I need to make is that I did not see him at the time, and so my statement has to be more generic about him and others like him that I know,

and what I understand about his illness." *Id.*  He opined further that given the long questions asked of Petitioner during his plea colloquy and the short answers that were given, he is not sure that it would be possible to determine if Petitioner were competent at that time.  Dr. Wood explained, "For example, I understood that he pled to giving alcohol to a minor.  I suspect as a factual matter that he would be able to competently say that he had done so.  And knowingly say that.  The larger issues, the more complicated things that he was charged with, I don't believe that he could have understood." *Id.* at 35.  He stated, "[i]t is impossible to know what he understood that he was saying 'yes' to.  And I consider it almost impossible, based on his prior psychometric record, my own interviews with him, and his PET Scan, that he understood the full significance of what he is being asked." *Id.* at 28.  Dr. Wood also noted that Petitioner's demeanor during the evidentiary hearing was much like his demeanor during the trial–very silent and downcast.  *Id.* at 17.

On cross-examination, Dr. Wood was asked why he didn't inform defense counsel of his opinion on Petitioner's competence at the time.  The following exchange occurred:

> [Molcan]: So you are telling this Court that on that particular day you had a question about his competency when you examined him?

> [Wood]: Well, I'm telling you that in answer to your question I think that there's a lot of this he didn't understand.

> [Molchan]: But you didn't tell anybody.

> [Wood]: Well, I believe that I did at some point.  I was presented pretty much with a *[fait accompli]* to the effect that he had pled.  Now, I didn't try to enter into a decision or a discussion about whether that was wise or not, and so I didn't really-I suppose, worry about whether he was competent to have done that.  I mean, I had to have assumed that they took responsibility for that .  I will tell you that I would not be surprised if he is hallucinating as I speak right now.  He does not look engaged or like he is processing what is going on.

[Molchan]: You don't think that he is competent to stand trial, not now or even in the past?

[Wood]: I feel more confident that he is not now competent. And he looks exactly like he did when I saw him during the trial. I did say something like that to his attorneys. And I do remember that. And especially to Ms. Stitt.

[Molchan]: And basically you were telling them that basically this man is not competent to stand trial?

[Wood]: What I said is "He's sick; he's hearing voices; he's not with it. And–and you should take that seriously." I believe that's the word that I used. It was in the context of the idea that the trial was in motion. And I believe that she said something like, "Well, we may lose more than we would gain by trying to interrupt the proceedings" and so on. There were discussions of that kind; I believe they were after I testified. But at least they were after he plead, and after he had some face time here in court.

*Id.* at 35-37. Dr. Wood also explained, "I think competency in schizophrenics by definition declines steadily beginning at about age–well, when they first have symptoms. And it does so on a roller coaster course so that sometimes a person is, and sometimes a person isn't competent, even though they are on a downhill course." *Id.* at 33. He also believes that one could be competent to understand some factual things, but not more complicated issues like the definition of a principal, for instance. *Id.* at 34-35.

Dr. Barry Crown, a neuropsychologist, also testified at the evidentiary hearing. He testified that he performed an evaluation of Petitioner about twelve to eighteen months prior to trial, which commenced in March of 2000, so it was near in time to the evaluations of Dr. Larson and Dr. Bingham. Dr. Crown testified that he evaluated Petitioner for competency and sanity, and he found Petitioner incompetent at that time (he did not offer a conclusion with regard to the sanity issue). EH Vol. 1 at 84-85. Dr. Crown testified during the penalty phase of Petitioner's trial and also performed a competency evaluation of him in February of 2005. *Id.* at 67. He did not find any

differences between Petitioner's evaluation in 1998 or 1999 and in 2005, although he did see more autistic-like symptoms in 2005. Dr. Crown stated, "I found Jonathon had significant language-based critical thinking problems. That he had neuropsychological impairments. And in summary I found that he was brain damaged." *Id*. at 85. Dr. Crown also testified with regard to Petitioner assisting in the postconviction proceedings that he needs to be led–"he needs to be prodded, coached, and directed in order to obtain information." *Id*. at 72.

Dr. Crown testified that he informed Mr. Killam that he found Petitioner to be incompetent, and Mr. Killam told him: " 'That's not going to get us too far.'" Dr. Crown explained, "[i]t was sort of to the effect that the train was leaving or had left the station, and it was going to the next place. And that wasn't going to get anyone anywhere." *Id*. at 86. He testified that he felt that it was the attorney's job to determine the strategy and testified that he told him, "if that's the only thing you can do, and that's your opinion then–that's what you need to do." *Id*. at 90-91.

On cross-examination, Dr. Crown acknowledged that Petitioner had been found competent in 1998 by Dr. Larson and Dr. Bingham and that there can be disagreements among professionals regarding a person's competency. *Id*. at 120. Dr. Crown acknowledged that Dr. Larson and Dr. Bingham had noted that there was the possibility of malingering by Petitioner. *Id*. at 69-71. He also clarified that he primarily communicated with Mr. Killam and is not sure whether he told Ms. Stitt that he felt that Petitioner was incompetent. *Id*. at 120.

While the testimony of Dr. Wood and Dr. Crown is troubling, the medical expert testimony at the evidentiary hearing is insufficient to positively, unequivocally and clearly generate a legitimate doubt as to Petitioner's competency. Both Drs. Wood and Napier (his testimony is summarized *infra* in Ground IV) admitted that they could not give a formal opinion as to Petitioner's competency at the time of the plea because they had not examined him close enough in time to render an opinion. While Dr. Crown and Dr. Wood testified at the evidentiary hearing that they both now believe Petitioner was

incompetent at the time, it is noteworthy that neither doctor informed the court of this opinion during their testimony in the penalty phase of the trial nor addressed Petitioner's competency to proceed during their testimony. *See* T. Vol. IV & V at 566-685. Furthermore, Dr. Larson and Dr. Bingham had found Petitioner competent in 1998. The fact that legal competency can be difficult to determine is evidenced by the fact that there is a difference of medical opinion on this issue between these experts who evaluated Petitioner at approximately the same time.

All of these factors, coupled with the fact that Petitioner presented no other witnesses who had interactions with him during the time in question to support his position, lead to the conclusion that Petitioner was competent at the time he entered his plea. While credible medical evidence was presented that Petitioner probably suffers from schizophrenia, which ebbs and flows, this diagnosis alone is not enough to convince this court that Petitioner was incompetent at the time that he entered his plea. This claim, therefore, fails on the merits. *See Wright*, *supra*, 278 F.3d at 1259, wherein the Eleventh Circuit addressed a similar claim. The court stated:

> As we have held, "'a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence.'" *Medina*, 59 F.3d at 1106 (quoting *James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir.1992)). Only "[a] petitioner who presents clear and convincing evidence creating a real, substantial, and legitimate doubt as to his competence to stand trial is entitled to a hearing on his substantive competency claim." *Id.* (internal quotation marks and citations omitted). The point is that on this claim, "the standard of proof is high and the facts must positively, unequivocally, and clearly generate the legitimate doubt" about whether the petitioner was mentally competent when he was tried. *Id.* (internal quotation marks, brackets, and citation omitted). "Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Id.* at 1107 (internal quotation marks, brackets, and citations omitted).
>
> Wright has not met that high standard. The fact that he suffers from chronic schizophrenia the effects of which have come and gone over the

years is not enough to create a real, substantial, and legitimate doubt as to whether he was competent to stand trial in January of 1987. His incompetency to stand trial seven and eight months later, like his incompetency to stand trial seventeen years earlier, is relevant, but it is not enough to counter the best evidence of what his mental condition was at the only time that counts, which is the time of the trial. The best evidence of Wright's mental state at the time of trial is the evidence of his behavior around that time, especially the evidence of how he related to and communicated with others then. The unrebutted evidence at trial is that in the days and weeks leading up to the trial Wright behaved in a perfectly normal fashion, related well to others, and had no problem at all communicating with them. There is no evidence that he behaved abnormally at trial, nor is there any evidence that he had any problem understanding the charges against him or communicating with his counsel. This claim fails on the merits.

**Ground IV:   Whether Trial Court Erred in Finding Petitioner's Plea Voluntary**

Petitioner alleges that he did not understand the consequences of his guilty plea due to his mental illness and the plea colloquy was insufficient to determine that his plea was voluntary.  He also alleges that he entered the plea involuntarily due to the misrepresentations by his trial counsel to him and to his mother that he would receive a life sentence and avoid the death penalty if he entered a plea of guilty.  *See* doc. 1 at 70-82.

1.      **State Court Proceedings**

Petitioner raised this claim in his motion for postconviction relief, and the postconviction court denied it.  The Florida Supreme Court affirmed, holding as follows:

Lawrence first asserts that the court below erred in denying his claim that his plea was not voluntary because: (1) Lawrence did not understand the consequences of his plea due to his mental illness and misrepresentation by his trial counsel; (2) Lawrence did not understand many of the substantive words used during the plea due to his mental illness and his low intelligence; and (3) based on Lawrence's mental illness and trial counsel's actions, the trial court's inquiry was insufficient to discover that Lawrence's plea was involuntary.

At the postconviction evidentiary hearing, conflicting testimony was presented as to Lawrence's competency at the time of his decision to plead guilty. In a very detailed order, the trial court resolved the conflicting evidence and denied this claim as follows:

> It is clear that a plea of guilty must be voluntarily made by one competent to know the consequences of that plea and must not be induced by promises, threats or coercion. The defendant has the burden of presenting substantial evidence establishing incompetence at the time of the plea. A defendant's competency at the time he enters a guilty or no contest plea is an issue bearing upon the voluntary and intelligent character of the defendant's plea.

> It is clear from the record that the Defendant suffers from a mental illness as evidenced by the testimony of several neurology/psychology experts. This coupled with the Court's observation of the Defendant as one who is quiet, silently withdrawn, exhibiting no outward reaction to these proceedings is indicative of the experts' characterization of various symptoms of his diagnosed illness. However, the Defendant's mental illness is not disputed; the tension exists in whether his mental illness interfered with his ability to enter a knowing and voluntary plea. *See generally Muhammad v. State*, 494 So.2d 969, 973 (Fla.1986) (stating "one need not be mentally healthy to be competent to stand trial")[.]

> Dr. Wood testified that the Defendant is schizophrenic and stated Defendant's statement that he was hallucinating provided a sufficient basis for him to render an opinion based on his knowledge of the psychosis that the Defendant was not competent at the time of the plea. However, Dr. Wood qualified his opinion and stated he did not examine the Defendant for competency and that his opinion is generic. As such, the Court is of the opinion that Dr. Wood's generic opinion today is insufficient to establish that the Defendant, Jonathan Lawrence, not a pseudo individual diagnosed with a similar psychosis, was incompetent at the time of his plea.

Similarly Dr. Napier testified that he did not interview the Defendant during or around the time of his guilty plea thus he could not have advised trial counsel of the Defendant's comprehension at that time. Dr. Napier's testimony concerning the Defendant's comprehension ability during the 2000 proceeding is based on a 1996 evaluation, which is several years prior to his competency evaluation in 1998 and the entry of his plea agreement. In fact, Dr. Napier testified that he was unable to give a formal opinion because he did not do an evaluation and his opinion is based on past history and behaviors and indicated there was "the possibility of not being competent." It follows and this Court finds that Dr. Napier's opinion of Defendant's ability to comprehend the proceedings based on his evaluation in 1996 is insufficient to support the theory that the Defendant was incompetent at the time of this plea.

Lastly, Dr. Crown testified that he evaluated the Defendant in 1998 and found that the Defendant had significant language based critical thinking problems and neuropsychological impairments, which in his opinion would render the Defendant incompetent at the time of his plea in March 2000. The Court finds that Dr. Crown's testimony is insufficient to establish that the plea was involuntary especially when buttressed against the weight of the evidence found in the record and produced during the evidentiary hearing which supports a finding that the Defendant's plea was indeed voluntary and knowingly entered.

The Court finds and it is clear from the record that every effort was taken on the part of the trial court and the defense attorneys to ensure that the Defendant was cognizant of the proceedings and understood the ramifications of his decision in light of his mental illness. For instance, competency evaluations were conducted in October 1998 by Drs. Bingham and Larson wherein the Defendant was found to be legally competent to proceed. Furthermore, Mr. Killam testified that during his representation he did not observe any degeneration of the defendant's ability to communicate, instead "he seemed as he was described to me." In addition, Mr. Killam testified that the Defendant was a good listener

and comprehended what was being discussed and he had the impression that Defendant was "capable of sitting through a trial, and conducting himself properly, and making decisions." Similarly, Ms. Stitt testified that she had two reports finding the Defendant competent and during the course of the representation his behavior "remained pretty consistent" thus not prompting her to feel the Defendant needed another competency evaluation. The Court finds trial counsel's testimony to be credible considering it was trial counsel who had repeated contact with the Defendant over a 22 month period and was in the position to notice if there was a deterioration of the Defendant's mental state. As such, the Court finds the Defendant has failed to establish that his mental illness effected his ability to understand the proceedings and the consequences of his actions in light of the fact the testimony revealed there was no change in the Defendant's ability to communicate and comprehend the proceeding from the time of the original finding of competence and the entry of his plea.

Moreover, the evidence is clear that trial counsel made no misrepresentations or promises to the Defendant regarding the sentence that he would receive if the Defendant pled guilty. For example, Mr. Killam testified that he did not promise a life sentence if the Defendant pled guilty nor was there a plea bargain from the State offering a life sentence in exchange for pleading guilty. Instead after a review of the evidence indicating the Defendant's guilt, a strategic decision was made to plead in the hopes that a presentation of the mitigating evidence would garner a life sentence. Likewise, Ms. Stitt testified that she never told Ms. Thompson that if the Defendant pled guilty they would save his life. Furthermore, Ms. Thompson testified that she had no specific recollection of being told by trial counsel that the State had offered life imprisonment in exchange for a plea and Ms. Carter testified that trial counsel never told her that there was an arranged benefit with the State that in exchange for a plea of guilty there would be a recommendation for a life sentence. Thus, the Court finds that the Defendant has not established that his mental illness coupled with the actions of counsel resulted in the Defendant not understanding the plea process or the consequences of his plea.

Additionally, the Defendant argues that due to his mental illness he was unable to understand the substantive terms used by the State and trial court. Mr. Killam testified that prior to the videotape conference there had been discussions about the plea process. Though Ms. Stitt had concerns about the Defendant's mental state, Ms. Stitt in her professional opinion coupled with repeated discussions and interaction with the Defendant over a 22 month period felt that he understood the process. Words such as "confederated" "due process" "combined" "principal" "aider" "abettor" were explained to the Defendant. Bearing in mind that the Defendant had a mental illness, counsel with the permission of the Defendant talked with the Defendant's [m]other Iona Thompson about the strategy of pleading and had Mrs. Thompson also explain the process because they felt "perhaps she would be the one who could better communicate with Jonathan"; that she would be able to say things in a way that the Defendant could understand his position. Thus, the Court finds the Defendant has not established that his plea was not voluntary or knowing based on this sub-claim.

In terms of whether the trial court was prevented by trial counsel's actions to discover that the plea was not voluntary and knowing, the record reveals that the trial court conducted an extensive plea colloquy wherein the trial court repeatedly questioned the Defendant as to the circumstances of the plea and whether the plea was actually the Defendant's decision. Notably on the issue of voluntariness, the Court inquired on two (2) occasions whether there was any form of coercion or promises. The questions were asked with a lapse of subject matter and posed in a different form.... Furthermore, the Court repetitively inquired of the Defendant with questions differing in form whether the decision to plead was his.... Similarly, the trial court repeatedly sought affirmation that the Defendant was aware that by pleading guilty that the only determination to be made would be whether he would be sentenced to death or given a life sentence without the possibility of parole.... With this in mind, the Court finds that the evidence is clear that trial counsel's actions did not prohibit the trial judge from determining whether the plea was voluntary and knowing considering the record is replete with the trial court's concern

with the Defendant's predisposition of being a follower. As illustrated above and throughout the plea colloquy, the trial court considered the Defendant's mental limitations and the concern was exhibited throughout the plea colloquy in the manner in which the questions were asked, rephrased, and addressed repeatedly to ensure the Defendant truly understood the nature of his plea and that the decision to plea [sic] was ultimately his decision. Any inference that the Defendant was given a set of questions to memorize in order to have the proper response is negated.

Consequently, the Court finds that the Defendant's guilty pleas to all four counts ... were entered into knowingly and voluntarily. The Defendant has failed to establish that his mental illness coupled with the alleged actions of counsel prohibited the Defendant from understanding the process or the consequences of his plea. The record reveals that the trial court explained that the Defendant was entitled to a jury determination of guilt, that the only sentencing options were life or death and the Defendant stated repeatedly that he understood the consequences of the plea, that he was not threatened or coerced and he was not under any medication that would impair his understanding of the decision.

(Citations omitted.)

In order to evaluate this claim in a postconviction setting, a court must answer two questions: "(1) whether the court could make a meaningful retrospective evaluation of the defendant's competence at the time of trial; and, if so, (2) whether the defendant was in fact competent at the time of trial." *Jones v. State*, 740 So.2d 520, 523 (Fla.1999).FN10 Some of the factors to be considered include: the defendant's appreciation of the charges and the range and nature of possible penalties; the ability to assist one's attorney and disclose relevant facts surrounding the alleged offense; the ability to manifest appropriate courtroom behavior; and the capacity to testify relevantly. *See id.* at 523 (relying upon Fla. R.Crim. P. 3.211(a)(1)).

FN10. Competency is considered a "sufficient present ability to consult with his lawyer with a reasonable degree of

rational understanding-and whether he has a rational as well as a factual understanding of the proceedings against him." *Id.* at 522 (quoting *Hill v. State*, 473 So.2d 1253, 1257 (Fla.1985)).

Lawrence attempts to rely upon *Jones* for relief, as a case in which this Court addressed whether a defendant was incompetent at the time of his trial. We find that case to be distinguishable. In *Jones*, the defendant brought a postconviction claim that he was incompetent at the time of his trial, and his competency to stand trial had never been tested. *Jones*, 740 So.2d at 521. In support, he attached affidavits from attorneys who had represented him during various stages, each of whom asserted that they had concerns as to his competency and who would have requested an evaluation if they had stayed on the case. He further attached affidavits from psychologists who asserted that Jones suffered from organic brain damage. *Id.* at 522. The postconviction court summarily denied the claim, and this Court reversed and remanded for an evidentiary hearing. After delaying a hearing for twelve years, the court below finally held the required hearing and then denied relief without elaboration. *Id.* This Court vacated the conviction and sentence, concluding that "the twelve-year delay undisputedly not due to appellant, the lack of psychological testing contemporaneous to trial, and the State's own evidence that a retroactive competency determination is not possible establish the inability to provide appellant a meaningful retrospective competency determination that complies with due process." *Id.* at 524.

In contrast to *Jones*, as the postconviction court pointed out, Lawrence was found to be competent by two experts prior to his trial. Neither of Lawrence's trial counsel noticed any deterioration in Lawrence's ability from the time of this finding. Moreover, prior to accepting the plea, the trial judge discussed Lawrence's mental issues with counsel, the defendant, and even the defendant's mother. Counsel and Lawrence's mother both asserted that the plea was Lawrence's decision, and they believed that he was not blindly following counsel's advice by accepting the plea. Moreover, Lawrence's defense counsel, Killam, asserted that he specifically inquired whether Lawrence was having any hallucinations or if there were other problems that would affect his decision to plead guilty, and prior to the plea, Lawrence told him that he had none of these issues. The court then engaged in a lengthy colloquy with Lawrence, repeatedly ensuring that Lawrence understood that the decision to plead was his alone, explaining the plea and its consequences repeatedly, and

rephrasing the consequences of his plea including the possibility of receiving the death penalty. The court found that Lawrence freely, voluntarily, and knowingly entered into the plea and that Lawrence's decision to plead guilty was his own, even in light of his limited intellectual ability and mental issues.

Lawrence essentially contests how the postconviction court weighed the evidence presented at the hearing, contending that the court did not give sufficient weight to the evidence which showed the potential effect of Lawrence's mental illness upon his plea and relied too heavily on trial counsel's testimony that they thought he understood the plea process. In conjunction with this claim, Lawrence contends that his reported hallucinations during the penalty phase showed that he was incompetent during the plea and that his trial counsel's concern with how to handle the overwhelming evidence of guilt supports his contention that they pressured him into the plea. Lawrence's arguments involve the weight of the evidence and demonstrate merely that there was conflicting evidence on this issue. As this Court has stated, "Evidence contrary to the circuit court's ruling is outside the scope of the inquiry at this point, for a reviewing court cannot reweigh the 'pros' and 'cons' of conflicting evidence." *Blackwood v. State*, 946 So.2d 960, 973 (Fla. 2006)(quoting *State v. Coney*, 845 So.2d 120, 133 (Fla. 2003)). Instead, a "reviewing court must defer to the circuit court's factual findings as long as those findings are supported by competent, substantial evidence in the record." *Id.* (quoting *Coney*, 845 So. 2d at 132-33). The postconviction court reviewed this claim in depth, reviewing and weighing all of the expert opinions and relying upon counsel's statements during the plea and during the postconviction evidentiary hearing. FN11 Moreover, the postconviction court reviewed the plea colloquy, noting how the original trial judge carefully asked Lawrence numerous questions, rephrased those questions, and addressed the same issues repeatedly to ensure that despite any mental limitations, Lawrence was able to understand the nature of the plea and that he faced a potential sentence of death. In this case, there is competent, substantial evidence to support the postconviction court's factual findings relative to this claim. Further, we find no error as to the postconviction court's conclusions of law. Thus, we deny this claim.

> FN11. Part of Lawrence's claims rely on an assertion that his trial counsel misrepresented the consequences of the plea proceedings and, in essence, promised him a life sentence if

he pled. However, such an assertion is contrary to Lawrence's testimony at the postconviction evidentiary hearing, when Lawrence admitted that Stitt told him "[t]hat they couldn't really do anything else for me. I had to plead guilty, and there's a *good chance* I would get a life sentence or that I would get the life sentence." (Emphasis added.) Clearly, this statement contradicts his other assertions that counsel had made a definitive promise about receiving a life sentence if he pled guilty and contradicts his assertions that he did not understand the impact of his plea.

*Lawrence II*, 969 So.2d at 301-06.

2.    Clearly Established Supreme Court Law

The test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to a defendant. *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S. Ct. 160, 164, 27 L. Ed. 2d 162 (1970) (citing *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S. Ct. 1709, 1711, 23 L. Ed. 2d 274 (1969)).  A plea of guilty is not considered knowing and voluntary unless the accused is reasonably informed of the nature of the charge against him, the factual basis underlying the charge, and the legal options and alternatives that are available.  *See Henderson v. Morgan*, 426 U.S. 637, 645, 96 S. Ct. 2253, 2258, 49 L. Ed. 2d 108 (1976). "A plea may be involuntary either because the accused does not understand the nature of the constitutional protections that he is waiving or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt.  Without adequate notice of the nature of the charge against him, or proof that he in fact understood the charge, the plea cannot be voluntary in this latter sense." *Henderson*, 426 U.S. at 645 n.13 (citation omitted); *Boykin*, 395 U.S. at 243 & n.5. A defendant receives 'real notice' of the charge when he has been informed of both the nature of the charge to which he is pleading guilty and its elements.  *Henderson*, 426 U.S. at 645–47.  The extent to which the elements must be explained varies with the circumstances, but at the very least, due process requires that the defendant receive a description of the "critical elements" of the charged offense, such as the element

defining the requisite intent. *Id.*, 426 U.S. at 644, 647 n.18. Additionally, the accused should understand how his conduct satisfies the elements of the charge, and this entails that the accused have sufficient background information about the facts of his case to make an informed decision about the case against him.

Due process does not require that the defendant, in pleading guilty, be informed of each element of the crime at the plea hearing. *See Henderson*, 426 U.S. at 647 (emphasis added). The defendant may receive detailed information about the elements of the offense beforehand, most commonly through his attorney. *See id.* Thus, for a plea to be knowing and voluntary, the defendant must be informed of the elements of the offense either at the plea hearing or on some prior occasion, and he must understand them. *See id.*

Due process also requires that a defendant's factual guilt of the crime charged be established. In a guilty plea situation, this requirement may be satisfied by a defendant's own solemn admission in open court that he is in fact guilty of the offense with which he is charged. *Tollett v. Henderson*, 411 U.S. 258, 267, 92 S. Ct. 1602, 1608, 36 L. Ed. 2d 235 (1973). However, an express admission of guilt is not a constitutional requisite to the imposition of criminal penalty. *Alford*, 400 U.S. at 37. "An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *Id.* When a defendant "intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt," a plea may be accepted even if accompanied by protestations of innocence." *Id.* The purpose of placing the facts on the record is not to establish guilt as a basis for a judgment of conviction, rather it is to aid in the constitutionally required determination that the defendant entered the plea intelligently and voluntarily, because it demonstrates a defendant's recognition that the evidence negates his claim of innocence and that he has nothing to gain by a trial and much to gain by entering a plea. *See McCarthy v. United States*, 394 U.S. 459, 467, 89

S. Ct. 1166, 1171, 22 L. Ed. 2d 418 (1969). However, a factual basis has been recognized as necessary only when a defendant proclaims his innocence and pleads guilty. *See Alford*, 400 U.S. at 38 & n.10.

"*Alford* is based on the fact that the defendant could intelligently have concluded that, whether he believed himself to be innocent and whether he could bring himself to admit guilt or not, the State's case against him was so strong that he would have been convicted anyway." *Henderson*, 426 U.S. at 648 n.1 (White, J., with whom Stewart, J., Blackmun, J. and Powell, J. joined, concurring). "[A] defendant cannot intelligently reach that conclusion, if he does not know the elements of the crime to which he is pleading and therefore does not know what the State has to prove; and his ignorant decision to plead guilty under such circumstances is not a reliable indication that he is in fact guilty." *Id.*

Additionally, "[t]he due process clause prohibits the trial or guilty plea conviction of a person who is mentally incompetent." *Dusky, supra*. The standard for determining competency to plead is the same standard applied to determine competency to stand trial, *i.e.* whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of understanding--and whether he has a rational as well as factual understanding of the proceedings against him." *Id*.

3.    Federal Review of Claim

While Petitioner alleges that the plea colloquy was insufficient, the record reflects that the trial court was aware that Petitioner had "some limitations in his functioning," so the court inquired if counsel were satisfied that Petitioner understood the consequences of entering a plea, given his "current mental situation and any psychological issues there may be." T. Vol. 1 at 4. Defense counsel Killam responded that he recognized that the mitigation will establish that "there is some problem with [Petitioner's] judgment and his ability to reason and think. But we think that he has the capacity to appreciate the effect of his guilty plea upon the penalty phase of the proceeding." *Id*. Both Mr. Killam and Ms. Stitt told the court that they believed that

Petitioner understood their strategy, *i.e.*, maintaining credibility with the jury and putting their emphasis on mental impairment mitigation, and that the decision to enter a plea was ultimately his. *Id*. at 4-6. The trial court also acknowledged that part of the defense theory was that Petitioner was "more of a follower-type" and asked counsel whether given this predisposition they were satisfied that Petitioner was not simply following them. *Id*. at 11. Ms. Stitt answered that this had been a major concern and a moral and ethical dilemma for her, but "I am satisfied at this point that he is not just following what we say. I think that he has sufficient understanding of the process to understand that this is in his best interest. And I think that it is his decision." *Id*. at 11-12. Mr. Killam noted that both Dr. Larson and Dr. Bingham had previously found Petitioner competent to proceed and stated, "I concur with what [Ms. Stitt] said. That is a concern. But I feel that I know the defendant well enough to know that he does understand that this is the best thing for him to do." *Id*. at 12.

Petitioner was then questioned extensively by the court and repeatedly asked if he understood the consequences of entering a guilty plea. *See id*. at 14-28. Petitioner was specifically cautioned if he understood that "the only two sentences that could be imposed as a result of you pleading guilty to the crime is either spend the rest of your life in prison with absolutely no chance of parole, which means that you would never get out of prison" or "that you would be sentenced to death either by lethal injection or by electrocution," and he answered that he understood that these were the only two sentences available to the court. *Id*. at 16. Petitioner repeatedly denied that he was threatened or forced to enter into the plea or that he was promised anything if he entered it. The trial court also gave Petitioner the opportunity to ask the court or his attorneys questions, and he declined. *Id*. at 20. Petitioner also repeatedly affirmed that he understood his attorneys' strategy and consented to it. The following exchange is illustrative of the repetitive nature of the court's questions to Petitioner:

> [Court]: Do you understand that this is your decision, not your attorney's decision or anyone else's decision; your mother's or anyone else's to make for you? This is your decision. Do you understand this?

**[Defendant]: Yes, sir.**

**[Court]: Is this decision to plead guilty your decision or is it your attorney's?**

**[Defendant]: It is mine.**

**[Court]: Is this decision to plead guilty your mother's decision or your decision?**

**[Defendant]: It is mine.**

**[Court]: And again, only you can decide whether or not to plead guilty. This decision is not your attorney's to make. And only you can make the decision. You're the ultimate authority in making this fundamental decision. Do you understand this?**

**[Defendant]: Yes, sir.**

**[Court]: And do you have any question about what I've just said or what I said earlier either questioning you or talking to the attorneys?**

**[Defendant]: No, sir.**

**[Court]: Is this decision yours alone?**

**[Defendant]: Yes, sir.**

**[Court]: Did your attorneys make this decision for you?**

**[Defendant]: No, sir.**

**[Court]: So it is your decision?**

**[Defendant]: Yes, sir.**

**[Court]: Finally, do you understand that a plea of guilty is more than a confession which admits that you did what you are accused of doing, that by a plea of guilt it is in itself a conviction?  And that nothing will remain but to enter a judgment of guilt and then determine the proper punishment which in your case is either life in prison or death.  Do you understand that?**

**[Defendant]: Yes, sir.**

*Id.* at 24-25.  The court also repeatedly questioned whether any promises had been made and specifically stated, "And I need to make it clear that no one has promised you if you make this decision, have they, that if you do this that you are guaranteed a life sentence.  Has anybody promised you that if you make this decision that you are guaranteed that you'll get a life sentence?"  Petitioner answered, "No, sir."  *Id.* at 26.

The court then questioned Petitioner's mother, Iona Thompson, regarding Petitioner's entering the guilty plea.  The following exchange occurred:

**[Court]: And I know it is an extremely difficult decision.  But it is important to me to make sure that Jonathan is making this decision given his limitations that he is making the decision and it is not a decision of you and not a decision of the attorneys.**

**And I know that he is going to lean on you, and I know he's going to lean on the attorneys for advice.  And that's natural and normal, particularly in his circumstances.**

**But I need to be satisfied and convinced that this is his decision and not one that you or anyone else have talked him into, coerced him into, threatened him into, promised him into, or anything else like that.**

**So, do you think that this decision is Jonathan's decision?**

**[Thompson]: I think that he has accepted this as his decision and he**

**understands that this is [the] best way to go.**

**[Court]: And do you think it is in his best interest?**

**[Thompson]: Yes, I do.**

**[Court]: Have you talked him into it?**

**[Thompson]: No.  I've talked with him but I haven't talked him into it.**

**[Court]: And as much as Jonathon is able you are satisfied that this is his decision?**

**[Thompson]: Yes.**

**[Court]: And neither Ms. Stitt or Mr. Killam have twisted your arm in any way or brow beat–**

**[Thompson]: No.**

**[Court]:–or forced you into this choice or decision?**

**[Thompson]: No, sir.**

**[Court]: And you don't have any indication that they have done this to your son, do you?**

**[Thompson]: No.**

**[Court]: And so you are satisfied, having listened to everything that I've said today and a couple of weeks discussion with counsel that this is in you son's best interest?**

[Thompson]: Yes, sir.

[Court]: And do you have any questions about what is going on here now, the plea, or the process?

[Thompson]:   No.  I understand.

*Id*. at 30-31.   The court then accepted Petitioner's plea, specifically finding "Mr. Lawrence's decision to plead guilty is his own decision.  And even given his limited functioning ability and psychiatric or psychological problems that the decision is his and his alone." *Id*. at 32.

When asked about entering the plea at the evidentiary hearing, Petitioner testified, "I think Miss Stitt wanted me to plead guilty.  Then my mom came up a little bit later on and told me that's what would be best to do."  EH Vol. III at 411.  He also testified that his understanding was that he would get a life sentence if he entered a plea of guilty, but when asked specifically for what was said, he testified, "That they couldn't really do anything else for me.  I had to plead guilty, and there's a *good chance* I would get a life sentence or that I would get the life sentence."  *Id*. at 412 (emphasis added).  Petitioner stated that he wanted to go to trial on his guilt, but his mother got him to change his mind.  *Id*. at 413.  With regard to the plea colloquy, Petitioner testified that he did not understand all of the questions, but answered them the way his lawyers told him to.  *Id*. at 437-38.

On cross-examination, Assistant State Attorney Molchan reviewed the State's evidence with Petitioner and questioned him as follows:

Q.  The lawyers told you that evidence was going to come out, didn't they?

A.  I think so.

Q.  Didn't they tell you that this was in your best interest based upon all the evidence to enter a plea so that they would have a good chance of saving

**your life at the penalty phase? Isn't that what they recommended to you?**

**A. I think so.**

**Q. And they never promised you anything, did they?**

**A. They said I wouldn't get the death penalty if I pleaded guilty.**

**Q. Isn't it true that they told you it was just a good chance of not getting the death penalty, that you stood a good chance of getting a life recommendation?**

**A. I thought they said I would get a life sentence.**

*Id*. at 445-46. Petitioner testified that he did not remember what Judge Bell told him about the possible sentences in the plea colloquy and when the penalty phase continued, he did not object "[b]ecause I just thought things would turn out okay." *Id*. at 446-47. Petitioner was also asked about a previous guilty plea he entered in the Livingston case in federal court in exchange for a life sentence, but he testified that he did not remember anything about it. *Id*. at 446.

Petitioner also alleges that defense counsel Stitt misrepresented to the trial court that she had had conversations with psychologists who told her that Petitioner had a complete understanding of what he was doing when entering his plea.[6] At the evidentiary hearing, neither Ms. Stitt nor Mr. Killam could recall or identify the

---

[6]Ms. Stitt complete statement is as follows:

"Your Honor, during the last two weeks while we were contemplating this decision I've had either in person or by phone almost daily contact with his mother, Iona Thompson. Iona is probably the best person in the world who can communicate with Jonathan and to relate things to him and to explain things to him in a way that he understands. And they have spoken almost daily by phone. And not only have we told him, she has reiterated, you know, what we have told him as well as what we have told her about the state of evidence, tactical plan. And we believe that not only through our conversations with him, but also conversations with psychologists and with his mother that he does have a complete understanding at this point of what he is doing." T. Vol. I at 6.

psychologists to whom she was referring.  *See* EH Vol. II at 287-88; 311; EH Vol. I at 175.
There is no evidence in the record that this statement by Ms. Stitt was significant in
either the trial court's finding the plea voluntary or in the postconviction court's
determination that Petitioner was competent to enter the plea.  Therefore, this court
does not consider this statement an important factor in its evaluation of this claim.

In addition to claiming that he was induced to enter the plea in order to receive
a life sentence, Petitioner also alleges that defense counsel mislead him into thinking
that his taped statements and crime scene photographs would not be introduced into
evidence if there was no guilt phase trial because they knew that these upset him.
When asked during the evidentiary hearing if she lied to Petitioner about the evidence
that would be introduced in a penalty phase, Ms. Stitt responded that "[h]aving the
death penalty phase in and of itself would have spared the parade of witnesses that we
thought would only harm Jonathon."  EH Vol. II at 291.  Ms. Stitt testified:

> [Collateral Counsel Michael Reiter]: Did you discuss with him the penalty
> phase aspect of what that meant in more–in more specificity than was on
> the tape?

> [Stitt]: Yes.

> [Reiter]: What did you tell him?

> [Stitt]: That we could go through the trial, and I felt like things might come
> out during the trial in greater depth and length than would come out in the
> penalty phase, and that I felt like, as Mr. Killam did, that we would have a
> greater chance of saving his life if we went directly to penalty phase given
> the mitigation that we had, given the fact that he had gone to Chapel Hill
> and had the PET Scan.  We had scientists who were willing to testify that
> he had non-functioning regions of his brain.  One of those regions that
> would help him be independent, make decisions, that kind of thing, would
> help us.

> Probably in hindsight with a Santa Rosa County jury maybe I should have
> known that those things wouldn't have worked, but I had great faith at that

time that it would work.

*Id*. at 324-25. When asked why the defense included Petitioner's mother in the plea discussions, Ms. Stitt explained that "Jonathon related much better to his mother than he did to his counsel." *Id*. at 304. Ms. Stitt also testified that they had had discussions with Ms. Thompson "probably three different times about an hour or hour and-a-half each time . . . [a]bout whether or not she felt through her conversations with Jonathon as to whether or not this is what he wanted to do." *Id*. at 306-07. Ms. Stitt denied that they ever told Ms. Thompson that if he pled guilty, they would save his life. She said that they told her "[t]hat we felt we had a better chance of saving his life." *Id*. at 307. Ms. Stitt explained that she thought Petitioner understood everything "because of all the discussions that we had had." *Id*. at 309. When asked whether she was concerned about some of the sophisticated words used in the plea colloquy, Ms. Stitt testified that they had gone over those words with Petitioner prior to the plea. *Id*. at 317.

Mr. Killam testified at the evidentiary hearing that "in the whole presentation of the case I wanted to give the Court that impression: That Mr. Lawrence was a cooperative, remorseful, compliant individual." EH Vol. I at 162. Mr. Killam recalled meeting with Ms. Thompson to discuss a plea in the case. He stated that "the evidence was such that we felt there would be a guilty verdict in the Guilt Phase. That it would be strategically unwise to waste the Court's time, as the ultimate sentencer in the case, over an issue that we felt was settled; that being his guilt." *Id*. at 166-67. Mr. Killam testified that he believed Petitioner was guilty, but did not recall telling him that he had no defense. He stated, "I probably told him I didn't think that we'd win if we went to trial, but I don't think that I left him without any hope. I mean, I try not to deal in absolutes." *Id*. at 167. Mr. Killam testified that he did not tell Ms. Thompson that if Petitioner pled guilty he could save his life. Mr. Killam stated:

> I told her that [plea] could try and save his life. And that the prospects of saving his life would be better, if we just went to the Penalty Phase, as opposed to going to trial where I felt like the jury would find him guilty, very quickly, and be somewhat annoyed that they had to sit through that.

And the Court as the ultimate sentencer.  Being that we were trying to present this cooperative, compliant, follower image of the defendant to the Court and the jury, for him to deny what seemed to be obvious from the evidence, I thought that would have been counter-productive.

*Id*. at 168-69.  When asked whether he told Petitioner that he would get a life sentence if he pled guilty, Mr. Killam testified that he did not, but told him that "his best chance of getting a life sentence would be to present himself to the Court and the jury as someone who was remorseful and recognized their wrongdoing."  EH Vol. II at 205.

On cross-examination, Mr. Killam testified he thought Petitioner seemed to be comprehending what he was telling him and was a good listener.  *Id*. at 209.  He knew that Drs. Larson and Bingham had found him competent, and that Petitioner had recently entered a guilty plea in federal court.  He continued, "[p]lus, my impressions of him were that he was capable of sitting through a trial, and conducting himself properly, and making decisions, as much as he was going to be involved in the process as far as who we called as witnesses and that type of thing."  *Id*.  Mr. Killam testified that the decision to enter the plea was Petitioner's and he was told that the possibility of getting a life sentence was greater with a plea.  He stated, "I would not have told him that, if he plead guilty, that I could get him a life sentence, because I can not guarantee him that."  *Id*. at 210.

Ms. Thompson testified with regard to the plea at the evidentiary hearing on direct examination by Mr. Reiter as follows:

[Q]: What did they [defense counsel] say–Did they say what would happen if [Petitioner] went to trial?

[A]: He would get death.  They assured me that he would get death.  That I had to do, I had to talk to Jon.  And–and I know in my heart that Jon was not guilty.  But I had, they, I had to tell him that it was okay to say that he was guilty so he could get life.

[Q]: Did Jon tell you that he wanted to plead guilty?

[A]: Jon never wanted to plead guilty; I never wanted to plead him guilty.

[Q]: How many times had they approached you, either together or by themselves, to ask you to get Jonathon to plead guilty?

[A]: Well, right before the proceedings. It was like a month, they were there, one of them or both of them. At least once or twice a week they were coming by. "We have got to get him to plead guilty" is what they were saying.

* * * * *

[Q]: What do you remember saying to Jonathon?

[A]: I remember he told me that he did not kill the girl.

[Q]: What did you say to him?

[A]: I told him I knew that.

[Q]: Okay. What did you say to him to get him to plead guilty?

[A]: I told him that the attorneys said that this was the only way that he could live. And I did not want him put to death, so I agreed that he could live.

[Q]: Did you have, after speaking to Mr. Killam and Miss Stitt and their explanation to you, were you of the belief that, if he plead guilty, that he could get death?

[A]: No. I thought if he pleaded guilty that he would get life.

[Q]: Why did you believe that?

[A]: I didn't have a whole lot to hold onto when I did that.

**EH Vol. I at 131-32; 134-35. Ms. Thompson testified that defense counsel did not tell her that Petitioner could still get death if he entered a guilty plea.** *Id*. **at 135. She also testified that when Judge Bell asked her whether the decision to enter the plea was hers or Petitioner's that while she said it was his, this was not true.** *Id*. **at 137. On cross-examination, Mr. Molchan asked Ms. Thompson about the plea, and the following exchange occurred:**

[Q]: Now when Mr. Killam and Miss Stitt were talking to you, they never represented that the State offered or made a recommendation that we would give life in exchange for a plea of no contest or guilty in this case, did he? Did they?

[A]: They made me feel that way. That's how I interpreted it.

[Q]: Listen to my question.

[A]: Okay.

[Q]: Did they ever tell you that the State had offered life imprisonment in exchange for a plea in this case?

[A]: I can't recall.

[Q]: They didn't do that, did they?

[A]: Not that I–I don't recall. I don't know. They said so much to me. If they did, I don't recall it. If they didn't–I was under the impression that that was what they were saying to me; that you had offered.

[Q]: That's your impression?

[A]: That was my impression.

[Q]: But as far as the specific recollection of–

[A]: I don't know that.

[Q]: And you had no specific recollection of that being communicated?

[A]: Correct.

*Id*. at 143-44.

As to the issue of his mental illness, Petitioner presented the testimony of Drs. Wood, Napier and Crown at the evidentiary hearing to support his claim that his mental illness prevented his knowingly entering the guilty plea.  The postconviction court found that the opinions of Drs. Wood and Napier were insufficient to establish Petitioner's incompetence.  The record supports this determination.  The relevant testimony of Dr. Wood has been summarized *supra* in Ground III.  Dr. Wood admitted that he could give only a generic opinion as to Petitioner's competence upon entering his plea because he did not see Petitioner at the time he entered the plea.  Dr. Robert Napier, a psychologist, testified that he evaluated Petitioner in 1996 as part of a claim for Social Security disability.  EH Vol. I at 44.  Dr. Napier's diagnosis was that Petitioner had a schizoaffective disorder which is a form of schizophrenia with an emotional component such as depression withdrawal; he also found that Petitioner had a "severe mental illness." *Id*. at 45.  Dr. Napier expressed that there was a reasonable doubt as to Petitioner's capacity to understand the more complex elements of the charges against him and that it is hard to know if he actually understood things when giving only "yes" and "no" answers. *Id*. at 49-50.  When asked if he was one of the psychologists that defense counsel referred to during the plea colloquy, Dr. Napier testified, "It could not have been me because I had not interviewed [Petitioner] for a couple of years, and I was not in any position to render a professional opinion because I had not evaluated him." *Id*. at 46-47.  On cross-examination when asked if he could give an opinion as to Petitioner's competency at the time of the plea, Dr. Napier again responded, "I did not

do the evaluation so I could not give you a formal opinion. Only that based on past history and behaviors, there would be very strong suspect, the possibility of not being competent." *Id.* at 60.

With regard to Dr. Crown, the postconviction court found that his opinions were insufficient "when buttressed against the weight of the evidence found in the record and produced during the evidentiary hearing which supports a finding that the Defendant's plea was indeed voluntary and knowingly entered." *Lawrence II*, 969 So.2d at 302. Dr. Crown's testimony on this issue is summarized *supra* in Ground III. The record supports the postconviction court's determination on this issue. The record reflects that Drs. Bingham and Larson had previously found Petitioner competent; that the defense attorneys both testified that they had met with Petitioner repeatedly and felt that he understood the consequences of entering the plea; and that the trial court conducted an extensive and comprehensive plea colloquy. Petitioner has not rebutted these determinations with clear and convincing evidence.

> The burden on the petitioner seeking federal habeas relief on grounds of incompetency is heavy. . . . "Courts in habeas corpus proceedings should not consider claims of mental incompetence to stand trial where the facts are not sufficient to positively, unequivocally, and clearly generate a real, substantial, and legitimate doubt as to the mental capacity of the petitioner."

*Sheley v. Singletary*, 955 F.2d 1434, 1438 (11th Cir. 1992)(quoting *Reese v. Wainwright*, 600 F.2d 1085, 1091 (5th Cir. 1979)). A lifelong history of mental illness and emotional problems does not demonstrate incompetency without a specific showing of how these difficulties generated a substantial doubt as to the petitioner's competency at the time in question. *Medina, supra*, 59 F.3d at 1106; *Card, supra*.

The Florida Supreme Court affirmed the postconviction court's determination holding that it defers to the circuit court's factual findings as long as they are supported by competent, substantial evidence in the record. *Lawrence II*, at 969 So.2d at 305. A federal habeas court must likewise give deference to the factual findings of state courts.

In this case, the record supports the state court's factual determinations with regard to this claim. While there is some question about the depth of Petitioner's mental illness, there is sufficient support in the record to determine that he was competent. It is hard to imagine the trial court being more thorough during the plea colloquy, questioning both defense counsel and Petitioner's mother. Petitioner answered consistently throughout the colloquy even though the court asked the same questions in different ways and at different times. Furthermore, Petitioner presented no competent or persuasive evidence that he or his mother had been mislead by false promises of a life sentence or otherwise improperly induced to enter a plea.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground V:    Ineffective Assistance of Counsel in Failing to Inform of Possible Defense**

Petitioner contends his trial counsel were ineffective in failing to inform him that he had a defense to the charges against him. He alleges that had he been properly advised, he would have wanted to have a trial on his guilt, especially in light of the fact that he did not receive a life sentence as a result of his guilty plea. Doc. 1 at 82-92.

**1.    State Court Proceedings**

Petitioner raised this issue in his motion for postconviction relief, and the postconviction court denied the claim. The Florida Supreme Court affirmed, holding as

**follows:**

In his second claim, Lawrence contends that the trial court erred in denying his several claims of ineffective assistance of counsel. Lawrence first asserted that his counsel was ineffective for wrongly pressuring him to plead guilty without informing him as to the potential defense theory of a codefendant's independent act; making misrepresentations that if he went to trial, he would be sentenced to death; and asserting that if he did not plead guilty, the trial would consist of gory photograph after gory photograph and witness after witness. The postconviction court denied these claims as follows:

> This Court has previously addressed the Defendant's contention of misrepresentation in Claim I and found neither trial counsel made any misrepresentations. The testimony revealed that no promises for a life sentence were made.... As such, the Court finds the claim of misrepresentation to be without merit.

> Moreover, Mr. Killam denied telling the Defendant there was no defense, instead he testified he probably told the Defendant that he did not think they would win at trial, "but I don't think I left him without any hope. I mean, I try not to deal in absolutes."Though Mr. Killam acknowledged that he did not remember whether he discussed the theory of independent act of a co-defendant with the Defendant, counsel testified there was evidence that indicated that the Defendant's claims "he did not kill her, did not participate, he had no knowledge" were false. This contention is reinforced by Ms. Stitt when she testified that the Defendant had admitted that he participated in certain acts that would indicate guilt as a principal. As such, the Court finds that the Defendant has failed to establish that being informed of such a defense would have altered the outcome of the case or would have succeeded at trial. *See e.g. Odom v. State*, 782 So.2d 510, 512 (Fla. 1st DCA 2001) (citing *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed.2d 203 (1985) ("where the alleged error of counsel is a failure to advise of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial")).

**(Citations omitted.)**

**In Lawrence's first subissue on this claim, he asserts that his counsel was ineffective in failing to inform him prior to the plea that a reasonable defense to the crime was to contest whether he was truly a principal to the crime since Lawrence asserted that he did not know his codefendant was going to kill the victim. Lawrence first contends that the court below used the wrong prejudice standard because the court below denied this claim after holding that Lawrence failed to prove that if he had been informed of such a defense, it "would have altered the outcome of the case or would have succeeded at trial." As to this point, Lawrence is correct. The present case involved a guilty plea, so the two-pronged *Strickland*FN12 test for determining ineffective assistance of counsel claims is slightly modified. *See Grosvenor v. State*, 874 So.2d 1176, 1179 (Fla.2004). Although the first prong of the *Strickland* test is the same, *i.e.*, deficient performance, in order to show the prejudice prong, a defendant must demonstrate "a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial." *Id.* (quoting *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed.2d 203 (1985)). This does not mean that courts refuse to look to the merits of any defense but instead find this factor relevant to "the credibility of the defendant's assertion that he would have insisted on going to trial." *Id.* at 1181. Accordingly, in determining whether a reasonable probability exists that the defendant would have insisted on going to trial, a court should consider**

> **FN12. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984).**

**the totality of the circumstances surrounding the plea, including such factors as whether a particular defense was likely to succeed at trial, the colloquy between the defendant and the trial court at the time of the plea, and the difference between the sentence imposed under the plea and the maximum possible sentence the defendant faced at a trial. As the Supreme Court emphasized in *Hill*, these predictions "should be made objectively, without regard for the 'idiosyncracies of the particular decisionmaker.' "**

***Grosvenor*, 874 So.2d at 1181-82 (quoting *Hill*, 474 U.S. at 60, 106 S. Ct. 366). The postconviction court, however, did not make a finding on this issue since it focused on the incorrect standard.**

Nevertheless, we find that this claim is meritless and does not meet the first prong of *Strickland*, deficient performance. There is insufficient competent, substantial evidence to support a claim of deficient performance based upon a failure to inform Lawrence of an available defense.

During the evidentiary hearing, Killam could not specifically recall whether he discussed the "independent act of a codefendant" defense with Lawrence. Killam did testify that he considered this defense, but he did not believe it was an effective or substantive defense to the murder in light of the strong evidence demonstrating that Lawrence was aware of the full scope of the plan, including the prior notes Lawrence wrote as to how the murder was to be carried out. Killam testified that he did not think that a jury would believe that Lawrence did not know that his codefendant planned to kill Robinson. Instead, Killam concluded that Lawrence's best chance of obtaining a life sentence would be to present Lawrence as someone who recognized his wrongdoing and was truly remorseful, and then rely upon the significant mitigating evidence, a tactic which was contrary to proceeding to trial. Killam strenuously stressed to his client that he believed pleading guilty would be the best way to avoid the death penalty.

Counsel Stitt testified that her assessment of the case was that Lawrence had "no real defense" that had any likelihood of success before the jury. Stitt could not recall whether she discussed the potential defense of a codefendant's independent act with Lawrence, but she did consider the defense. However, the biggest impediment to this defense was that she thought Lawrence had admitted to participating in certain acts which showed his guilt as principal to the crime. Based on Lawrence's admissions to counsel, this defense was not available, and counsel was not ineffective in failing to inform Lawrence about a defense which would not apply to him. Based upon this evidence, we conclude that Lawrence failed to show that counsel performed deficiently so as to breach the standard for defense counsel as set forth in *Strickland*.

Furthermore, even if we assume that counsel's performance was deficient in not discussing this defense with Lawrence, Lawrence has not demonstrated "a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial." *Grosvenor*, 874 So.2d at 1179 (quoting *Hill*, 474 U.S. at 59, 106 S. Ct. 366). Lawrence failed to present any evidence or testimony that if he

had known about this defense, he would not have pled guilty.FN13 In fact, the testimony from the evidentiary hearing shows that Lawrence's decision to plead guilty was based on his belief that it would provide a better chance of avoiding the death penalty. During the evidentiary hearing, Lawrence asserted that the reason he did not have a trial was in order to avoid the death penalty. After talking to counsel and his mother, all of whom recommended that he plead guilty, he decided to enter a plea because there was a "good chance" that he would get a life sentence. Accordingly, we deny this portion of the claim.

> FN13. As discussed in *Grosvenor*, however, a petitioner's assertion that he would have insisted on going to trial is not the only consideration-the court below must weigh the credibility of such assertion and make an objective analysis of the claim in light the factual circumstances surrounding the plea. *See Grosvenor*, 874 So.2d at 1181-82.

*Lawrence II*, 969 So.2d at 306-08.

### 2. Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

### 3. Federal Review of Claim

The Florida Supreme Court cited *Strickland* as the legal standard for analyzing claims of ineffective assistance of counsel and applied those standards to Petitioner's claims. *Lawrence II*, 969 So. 2d at 307. The court, therefore, applied the correct legal rule based on Supreme Court precedent. Accordingly, the remaining issue is whether the state court's denial of Petitioner's claim resulted in an unreasonable application of *Strickland*.

Petitioner's primary assertion is that he had a viable defense to the murder charge because he had no intent to harm Ms. Robinson and had no knowledge that his co-defendant, Jeremiah Rodgers, intended to harm her. He also alleges that had his attorneys informed him of an independent act defense, he would have gone to trial on the issue of guilt. Respondents assert that this defense would not have been available

to Petitioner and even if it had, the risk in making an independent act defense to the State's principal theory was that this would open the door to the State introducing two prior murders that Petitioner had participated in with Mr. Rodgers.[7]  Doc. 6 at 96-99. Petitioner does not address this argument in his petition or his reply.

Mr. Killam addressed this issue at the evidentiary hearing and testified that he was aware of the independent act by a co-defendant defense, but did not remember discussing it with Petitioner.  EH Vol. I at 178.  When asked why he thought Petitioner was guilty despite claiming that he did not have any knowledge or participate in the murder, Mr. Killam responded, "[t]here was other evidence that convinced me other than what I heard from him that circumstantially he certainly did know it was going to happen."  *Id*.  When asked about the note(s) written by Petitioner outlining some aspects of the crime, Mr. Killam testified that he thought they were incriminating and had Petitioner testified about it Mr. Killam stated, "I don't believe that his explanation would have carried the day with the jury on that issue." *Id*. at 190.[8]

On cross-examination, the following exchange took place between Mr. Molchan and Mr. Killam regarding whether Petitioner was a principal in the crime:

> [Q]: So the fact that he wasn't, that Mr. Lawrence may, may or may not have told you that he was not the shooter, did that have much of an impact on you as far as your review of the evidence in this particular case?

---

[7]The details of the two prior murder convictions are outlined in *Lawrence I*, 846 So.2d at 443 n.3. Petitioner pled guilty to capital felony murder in federal court in June 1999 (the Livingston case), and entered a plea of nolo contendere to principal to first-degree murder in March 2000 (the Smitherman case).  Mr. Rodgers was the co-defendant in both cases.

[8]The contents of the notes referred to were summarized in *Lawrence I*, 846 So.2d at 443, as follows:

> One page of the recovered notes states in part: "get her very drunk," "yell in her ears to check consicouse [sic]," "even slap hard," "[r]ape many, many, many times," " 'slice and dice,' [d]isect [sic] completely," "bag up eatabile [sic] meats," and "bag remains and bury and burn." Another page of notes provides a list of items and tasks, some of which had been checked off or scribbled out. That list includes "coolers of ice = for new meat," strawberry wine, everclear alcohol, scalpels, Polaroid film, and ".380 or-and bowies [knives]."

**[A]:   No.  Not as far as my feeling as to what the jury would think of the guilt or innocence on that count, no.**

**[Q]: And why is that?**

**[A]: Well, because he, he had participated in it.  And–and there had been another instance where something like that had occurred.  And I felt like the circumstances of that would be such that it would be incredible to argue that he didn't know what was going to happen when it had already happened.**

**[Q]: And in fact, you were aware that the defendant had been involved in an attempted murder with the co-defendant?**

**[A]: Correct.**

**[Q]: And had been involved in a Federal murder which occurred on United States Government soil which resulted, both of which had resulted in convictions with the same co-defendant?**

**[A]: Yes.**

**[Q]: Did that–Isn't it true that that particular aspect of this case was something that you took into consideration in coming up with a strategy or tactic of how you were going to handle it.**

**[A]: I felt that was a very, very big factor as far as how a jury would view the evidence.  Yes.**

**[Q]: Did you think that they would believe that he didn't know what was going to happen on that night?**

**[A]: No.  I didn't think that they would believe that.**

**EH Vol. II at 202-03.  Mr. Killam testified that he did not think it would be fruitful to try**

to convince the jury that Petitioner did not know what was going to happen to Ms. Robinson and the effect of putting Petitioner on the stand would have been that "[h]is involvement would be greater." *Id*. at 207. Mr. Molchan asked Mr. Killam:

> [Q]: And did you, in your years of experience at this point in time, do you think that would have been a wise move to place the defendant on the stand and subject him to cross-examination with the evidence that was available?

> [A]: No.

> [Q]: Now, incumbent, and also the statement issue was the idea of the note in this situation, you were aware of the contents of the note, were you not?

> [A]: Yes.

> [Q]: And do you feel that the note was a substantial piece of evidence that impacted upon your strategy and tactics in this case?

> [A]: Yes.

*Id*. at 207. On redirect, Mr. Killam was asked about whether the evidence of the prior crimes could come in, and he testified that while no *Willams* Rule[9] Notice had been filed, his feeling was that the evidence would come in. *Id*. at 214. On recross, Mr. Killam testified that he has been involved in cases where another murder has been allowed into evidence via the *Willams* Rule, and he saw that as a potential in this case. *Id*. at 227.

---

[9]*Williams v. State*, 110 So.2d 654 (Fla. 1959). Fla. Stat. Section 90.404(2)(a)(1998) provided in part, "[s]imilar fact evidence of other crimes, wrongs or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity." While the State must provide notice of its intent to use *Williams* rule evidence in its case-in-chief, no notice is required for the State to use the evidence for impeachment or on rebuttal. *See id*. 90.404(2)(c)(1).

Ms. Stitt testified at the evidentiary hearing that Petitioner told her that he did not know that Mr. Rodgers was going to shoot Ms. Robinson.  *Id.* at 274.  However, she testified that "there was certainly sufficient evidence at that point that he had participated in certain aspects" of the crime.  *Id.*   Ms. Stitt testified that "[i]t was my belief at the time" that he did not have a legal defense to the crime.  *Id.* at 289.  While Petitioner did not admit to shooting Ms. Robinson there were the notes found in his trailer outlining the crime, "the confessions that he made, as far as having sex with a dead body" and other things that she could not recall that were damaging.  *Id.* at 313.  She also testified that Petitioner "did not deny specifically knowing about [the shooting]."  *Id.*  Also, Petitioner had discussed the crime with Detective Hand.  When asked whether she was assessing Petitioner's guilt, Ms. Stitt responded that that was her job as his attorney.  She believed that Petitioner was guilty of certain things.  *Id.* at 315.

On cross-examination by Mr. Molchan, the issue was discussed as follows:

[Q]: Now, when you were talking or discussing with Mr. Reiter the fact that–or you made a comment about there not being a legal defense in this particular situation.  Is that a misstatement from your standpoint maybe upon hindsight looking at that?  Or is that a portion of your assessment of the case?

[A]: It was an assessment of the case bearing on what I believed was going to be introduced that he would be found guilty in a guilt/innocence phase.

[Q]: And it's your recollection that he admitted to you certain–participation of certain acts that would indicate guilt–as indicate guilt as a principal?

[A]: Yes.

[Q]: Now, the note that was recovered in this particular case, did you and Mr. Killam discuss the ramifications of the admissibility of that note and what you thought it would do to a jury?

[A]: Yes.

[Q]: And what was your–what was your assessment of that?

[A]: That it would be very damaging.

[Q]: In fact it was–it equated to a confession in many ways, did it not?

[A]: It did.

[Q]: Because there was handwriting–the handwriting experts stated that it was done in his hand, correct?

[A]: Correct.

*Id*. at 326-27.  Ms. Stitt also acknowledged that Petitioner had pled guilty as a principal in the Smitherman case which they also had to take into consideration.  *Id*. at 328.

Petitioner testified at the evidentiary hearing that he did not know Mr. Rodgers was going to shoot Ms. Robinson, nor did he participate in the killing or plans to kill Ms. Robinson.  EH Vol. III at 408.  He also testified that he wanted to have a trial on his guilt, but did not because based on his attorneys' statements, he thought he would get the death penalty if he went to trial.  *Id*. at 409.  He testified, "I think murder is killing someone and principal is just I think being there when someone else kills someone."  *Id*. at 410.  He also testified that his attorneys did not tell him that if the jury believed his story he could be found not guilty.  *Id*. at 434.

On cross-examination, Mr. Molchan asked Petitioner about the evidence against him:

[Q]: Let's talk about the Robinson case a little bit. Did the lawyers talk to you about the evidence in that case, in the murder of Jennifer Robinson?

Objection and ruling omitted.

**[Q]: Did they talk to you about a note that was written?**

**[A]: It's always hard to tell what they talk about, so it's hard to know what's going on.**

**[Q]: Isn't it true that they talked to you about a note that was written by you that outlined the plans for the murder of Jennifer Robinson in some shape? Didn't they talk to you about that?**

**[A]: I think so.**

**[Q]: They–what did they tell you?**

**[A]: Somebody said I wrote it or that it looks like my handwriting.**

**[Q]: And did they state to you that that was particularly–that that evidence was going to convict you?**

**[A]: I thought they said it was kind of bad or it might look bad.**

**[Q]: What truck was used to transport Jennifer Robinson?**

**[A]: That was mine.**

**[Q]: The lawyers told you that evidence was going to come out, didn't they?**

**[A]: I think so.**

**[Q]: Didn't they tell you that this was in your best interest based upon all the evidence to enter a plea so that they would have a good chance of saving your life at the penalty phase? Isn't that what they recommended to you?**

**[A]: I think so.**

*Id.* at 444-45. In his habeas petition, Petitioner concedes that the notes and other actions "constitute strong circumstantial evidence toward establishing the charge of 'principal,'" but he maintains that his explanation to the jury about the notes' contents as well as his mental illness and Mr. Rodgers' powerful influence over him could have persuaded the jury to find him not guilty. Doc. 1 at 85.

The assessment of the evidence in any case is part of an attorney's job, and both Mr. Killam and Ms. Stitt believed that the evidence of Petitioner's guilt was strong and that it was in his best interest to plead guilty in an effort to minimize the amount of evidence that would be put before the jury in a guilt phase trial. Petitioner has not demonstrated that his counsel was not familiar with the evidence, and while they may not have discussed every aspect of the independent act defense with Petitioner, the evidentiary hearing reveals that they both were aware of this defense but felt that other evidence of Petitioner's participation in the crime precluded it. Petitioner also testified that some of the damaging evidence was in fact discussed with him. Petitioner has not demonstrated that his counsels' assessment of his case or strategy in the case was deficient. Defense counsel utilized their training and experience to analyze the evidence against Petitioner and made a reasoned professional determination that an independent act by a co-defendant defense would not be successful. They were also aware of Petitioner's prior participation in two crimes with Mr. Rodgers which would bear on his credibility as to whether he had any knowledge of the acts planned against Ms. Robinson. Petitioner has not demonstrated ineffective assistance of counsel by either prong of *Strickland*.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States

Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

## Ground VI:  Ineffective Assistance of Counsel/Closing Argument

Petitioner alleges that his trial counsel were ineffective in conceding the cold, calculated and premeditated ("CCP") aggravating factor; by making derogatory and prejudicial comments about him in closing argument; and in failing to show the reliability and voluntariness of his statements to police. Doc. 1 at 92-101.

### 1.    State Court Proceeding

### a.    CCP

Petitioner raised this issue in his motion for postconviction relief, and the postconviction court denied the claim. The Florida Supreme Court affirmed, holding as follows:

> As to the CCP claim, Lawrence contends that his attorney conceded this aggravator numerous times and then later contested CCP in his written memorandum to the judge, asserting that this aggravating factor was not established because expert opinion demonstrated that Lawrence lacked the ability to plan such an event on his own. The postconviction court denied this claim, finding that the defendant's characterization of the statements lacked merit and that Killam was asserting that the mitigating circumstances outweighed whatever aggravation was established. The court further found that this was a strategic decision in attempting to avoid the consequences of overwhelming evidence of the commission of an atrocious crime by making some halfway concessions to the truth to give the appearance of reasonableness and candor to gain credibility with the jury.
>
> In order to prove that counsel was ineffective, Lawrence must show that his counsel's performance was deficient and that he was prejudiced by this deficient performance. This Court defers to the trial court's factual

findings so long as they are supported by competent, substantial evidence but reviews the trial court's legal conclusions de novo. *See Dillbeck v. State*, 882 So.2d 969, 972-73 (Fla.2004). Lawrence is not entitled to relief on this claim because he cannot prove that he was prejudiced by this alleged deficiency. Plainly, the horrendous facts of the victim's murder provide competent, substantial evidence in support of this aggravator. Lawrence wrote down the notes as to how he and Rodgers would accomplish the murder, and then they followed these notes. Lawrence obtained the gun that was used in the crime. He had a book on the human body in which a portion of a leg was circled, the very part of the victim which was cut off and found at Lawrence's home.

*Lawrence II*, 969 So.2d at 309-10.

2.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

3.      Federal Review of Claim

Petitioner cites four instances in which he alleges Mr. Killam conceded the CCP aggravator to the jury during his closing statement in the penalty phase of the trial. Mr. Killam stated:

> *The CCP, the cold, calculated, and premeditated aggravator that the State has attempted to show in this case, we admits it's there to that extent because you have this note, this planning, and all of that business.* But keep in mind, this was not the act of the Lone Ranger; he was with somebody else. And I submit to you that my client is not the Lone Ranger. If he's anybody, he's Tonto. Dr. Napier said some very insightful things about this case. He talked to you about Mr. Lawrence's behavior, how he was withdrawn, how he was shy, how he spoke softly, how he avoided eye contact; and he pointed out what was important to him, in reading over the statements, was that the activity of Mr. Lawrence was such that he couldn't look his victims in the eye. And the State would have you believe that this was cold. I submit to you when you won't look somebody in the eye, you're not feeling cold. What we're talking about is the type of behavior up there at the top. When you look somebody in the eye and slowly take the life out of them, torture them, and enjoy it. That's a psychopath. That's a Ted Bundy. Jonathan Lawrence is not that. He has a conscience. He is not without a conscience. If you had to look at one factor in this, to cut this case down the middle, it's conscience. You read the statements.

They're replete with instances where he's expressing his remorse for what happened.

**T. Vol. III at 931-33 (emphasis placed on portions cited by Petitioner. Doc. 1 at 95).**

* * * *

He is mentally ill. That's a fact. *So, you said, well, this was cold and calculated. He wrote out these notes, he figured out what he was going to do; all this he did because it was just a cold, calculated, premeditated thing.* Well, it's interesting to note in his statement that when Todd Hand is asking him, on page 23, about the note being written, he said, "You wrote it down." He says, "I wrote in down," and then Hand referring to Jeremiah, "Did he participate in the subjects here by getting you to write them?" "Yeah, he just tell me bad things to write down, and I'd think of a few, and I'd write stuff down, throw the paper away and try not to think about it too much after that." Then when he goes to the store, buying things. "Was somebody with you when you bought the stuff?" "Yeah, Jeremiah was with me. I went there to buy some dogfood or something, I don't remember." Anyway, he was not acting on his own. *When all this stuff was done–all this cold, calculated, premeditated stuff–Jeremiah was influencing him, a person who, according to the testimony which is unrebutted before you, is easily led*.

*Id.* at 936-37.

* * * *

There is a moral reason why he should not be put to death. He did not squeeze the life out of anybody in a tortuous manner and enjoy it. He engaged in some bizarre, sick behavior under the substantial domination of another person. *These mental mitigators greatly outweigh the alleged cold, calculated, and premeditated, because there wasn't anything any warmer or colder about Jonathan Lawrence's blood when this happened, because he's always been the same*. He was doing what he thought was a fantasy turned into reality. He got caught up in it, he got caught up in a series of events, because he is weak-minded and he has been dominated.

*Id.* at 940.

During the evidentiary hearing, Mr. Killam testified that he did not remember discussing conceding the CCP aggravator with Petitioner. EH Vol. I at 185. Mr. Killam also testified that he felt the CCP aggravator was the strongest one and that the notes

showed some premeditation on Petitioner's part. *Id.* at 190. When asked on direct examination if he helped the State establish this aggravator, Mr. Killam responded, "I don't believe that I was doing that in the entire context of my argument. I think that you're nitpicking at certain things. There was not a consistent theme running through my closing that revolved around CCP being established by the State." *Id.* at 191. He also stated, "I felt like the mitigation was so substantial that it outweighed that CCP that I made reference to. And I didn't think it would carry the day for the State, given all of the other evidence." EH Vol. II at 216.

Petitioner contends that *Florida v. Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004), in which the Supreme Court stated that an attorney must consult with the client regarding important decisions, including the decision to plead guilty, should apply where counsel concedes an aggravator when counsel fails to discuss the strategy with the client. Respondents argue that *Nixon* does not apply to the concession of aggravators and point out that the Court in *Nixon* explained:

> An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. *Strickland*, 466 U.S., at 688, 104 S. Ct. 2052. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." *Taylor v. Illinois*, 484 U.S. 400, 417-418, 108 S. Ct. 646, 98 L. Ed.2d 798 (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval). But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed.2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1, 97 S. Ct. 2497, 53 L. Ed.2d 594 (1977) (Burger, C. J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

\* \* \* \*

To summarize, in a capital case, counsel must consider in conjunction

both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter; no tenable claim of ineffective assistance would remain.

*Id.*, 543 U.S. at 187; 192. Because the concession of an aggravator was not explicitly listed by the Court as being one of the important decisions which require the duty to consult the client, *Nixon* does not require that defense counsel obtain a defendant's consent before conceding an aggravator.

Therefore, this claim is properly evaluated under *Strickland*, and it is necessary to understand counsel's penalty phase strategy in determining whether Petitioner can meet his burden on this claim. In this case, Mr. Killam explained that given the evidence, it was in Petitioner's best interest to enter a guilty plea and make a strong case for mitigation in the penalty phase in the hopes of obtaining a life sentence. Mr. Killam told the court during the plea colloquy, "[r]ather than losing credibility with the jury and–by arguing that the state had not met a burden that we feel is obvious from the evidence, that our best strategy is to put on our best case, which is the mitigation, surrounding his mental impairment. T. Vol. I at 4-5. Petitioner was present in court when this strategy was explained. The Supreme Court has recognized that counsel is not deficient for being candid about his client's crimes and unwilling to challenge the jury's finding of guilt. *See Nixon*, 543 U.S. at 190-92 ("Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous." *Id.* at 191).

The state court found that "the horrendous facts of the victim's murder provide competent, substantial evidence in support of this aggravator," and that Mr. Killam was

attempting to lessen the impact of the State's evidence "by making some halfway concessions to the truth to give the appearance of reasonableness and candor to gain credibility with the jury." *Lawrence II*, 969 So.2d at 309. A review of the entire closing argument supports this determination. Mr. Killam acknowledged that evidence of premeditation existed but explained that Petitioner's mental illness prevented him from forming the requisite premeditation necessary for a finding of the CCP aggravator. He also emphasized another defense theme which was that Petitioner was a follower and easily dominated by his co-defendant Mr. Rodgers. Mr. Killam made the strategic decision to focus on emphasizing that the mitigating factor of mental illness outweighed whatever evidence of aggravation the jury may find.

Petitioner has not demonstrated that Mr. Killam's performance was deficient given the facts of the case. *See Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). The state court found that Petitioner had not demonstrated prejudice under *Strickland* based on the facts of the victim's murder, including that "Lawrence wrote down the notes as to how he and Rodgers would accomplish the murder, and then they followed these notes. Lawrence obtained the gun that was used in the crime. He had a book on the human body in which a portion of a leg was circled, the very part of the victim which was cut off and found at Lawrence's home." *Lawrence II*, 969 So.2d at 309-10. Finally, Petitioner does not cite any Supreme Court cases holding that an attorney arguing a different position in his sentencing memorandum to the court from one argued before the jury is ineffective assistance of counsel. Because the jury did not read the memorandum, Petitioner has not demonstrated deficient performance with regard to this inconsistency.

The state court's factual findings are supported by the record and must be given

deference by this court.  Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence.   Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.  Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law.  Therefore, Petitioner is not entitled to habeas relief on this ground.

      b.    Derogatory comments

Petitioner alleges that Mr. Killam demeaned him by making derogatory comments about his brain during his closing argument in the penalty phase of his trial.

      1.    State Court Proceedings

The Florida Supreme Court held as follows:

> Next, Lawrence contends that trial counsel was ineffective because he used derogatory words like "little pea brain" to describe Lawrence. The court below denied this portion of the claim, finding that counsel made these statements in an attempt to show Lawrence's brain was defective and different from an average person's-that Lawrence was mentally impaired through no fault of his own. The court concluded that "the comments used by the defense counsel was a reasonable trial tactic in order to dramatize and reiterate to the jury that the Defendant suffered a mental illness that was a direct result of brain damage and interfered with his ability to function."

> Lawrence contests this ruling, relying upon this Court's decision in *State v. Davis*, 872 So.2d 250 (Fla.2004), to support his claim of error. In *Davis*, defense counsel, who was representing an African-American defendant accused of killing a white woman, made numerous comments of racial prejudice during voir dire. This Court granted the defendant a new trial because the prejudice expressed by counsel "so seriously affected the fairness and reliability of the proceedings that our confidence in the jury's verdicts of guilt is undermined." *Davis*, 872 So.2d at 253. Lawrence acknowledges that Davis addresses only race but contends that this rationale should be extended to apply to the mentally disabled as well. We

disagree. Although counsel could have used different terminology, counsel was not making those statements for the purpose of belittling Lawrence but to express that the evidence elicited from the position emission tomography (PET) scan demonstrated that Lawrence had brain damage and diminished Lawrence's moral culpability, which is an extremely relevant consideration. Accordingly, we deny this portion of his claim.

*Lawrence II*, 969 So.2d at 310.

### 2.    Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

### 3.    Federal Review of Claim

Mr. Killam made the following comments during his closing argument in the penalty phase of his trial:

> The Judge is going to instruct you that you've got to make a decision that is a moral reasoned response to the evidence that you have heard. And I submit to you that being an organically brain-damaged and mentally impaired person, who acts under the substantial domination of another person who he met in a state hospital where he should've never been let out of, is not the most aggravated and nonmitigated murder you could have. The moral response to that is, we don't execute the mentally ill. You see, when he was born, there were some traumas that occurred. Certainly, this traumatic event in Ms. Thompson's life where her parents died where she was just a month from delivering Jon. It could've been a problem. And if you consider this head, his little brain, let's give him a little crack for that, give him a little crack for his dad's siblings being schitzoids. And then consider the fact that at four years old, his mother's in an awful car accident.  After that, he'd never write.  You heard that from Nadine Goldstein.  He repeats first grade.  The comments of the teachers about him being in a fantasy land, just—never really being mentally present in the courtroom [classroom], is very revealing.  And that's the kind of thing that the clinical psychologists look into.
>
> Very unusual to happen to somebody, to have their name changed—have their name changed.  Then a major trauma, Elbert is arrested for sexual battery upon his stepdaughter, who thought he was her real father up until the time that this happened.  Obviously Elbert is the only father figure in

the family. I'm sure he looked up to his father even though he was accused of this crime in its present form. You know, it's during this period of time that he starts having problems with the law. Another crack on that head. Then he's in jail, and his brother dies; three or four other people die that are close to him. Then he goes to the mental hospital and what happens in the [mental] hospital? Well, I think things start unraveling. He begins to hang around Jeremiah Rodgers and Jeremiah Rodgers starts injecting his thoughts. *This little brain that has no activity in the left frontal and temporal lobe along–which is, by the way, the doctor–Dr. Wood–wrote a paper right on point on that being related to schizophrenia. So, you've got this brain that's been impacted by this man–this little pea brain.* Then they go and they drink. What do you expect is going to happen?

**T. Vol. III at 934-35 (emphasis placed on portions cited by Petitioner. Doc. 1 at 99).**

* * * *

If you have to err, you should err on the side of mercy. *There's a sixteenth century poem that expresses this, I think, a little bit better than I can, and I'd like to read it to you. I'm having a little left frontal lobe problems right now, and I'm afraid I'll forget this.* I have memorized it in the past, but it goes like this. "No man is an island entire unto himself. Every man is a piece of the continent, a part of the main. If a clog be washed away by the sea, Europe is the less. Any man's death diminishes me because I'm involved in mankind; and, therefore, never to know for whom the bell tolls. It tolls for thee." When the victim died and the bell tolled, it tolled for all of us, because her death diminished all of us, just like the death of Jonathan Lawrence will diminish us because we're all part of mankind.

*Id.* **at 939.**

* * * *

But in this case, you have had quality evidence put before you, that has not been tarnished or rebutted, by good, qualified experts. Cutting edge technology. And one day, we'll know more about the brain than we know now. *But it's real clear that left frontal temporal lobe damage affects your ability to think. Once that's knocked out, then you're back here and your reptilian brain acting out a fight like an animal. That man has a conscience, he's not totally bad.*

*Id.* **at 943. Petitioner alleges that these comments prejudiced the jury against him.**

At the evidentiary hearing, Mr. Killam was asked by collateral counsel whether calling Petitioner a "little brain" was trying to elicit sympathy with the jury. He responded, "I was emphasizing the fact that he did not have the same brain that they did; that it was defective." EH Vol. I at 194. When asked about the "pea brain" comment, Mr. Killam again responded that he was trying to emphasize that Petitioner had a mental problem–a different brain than the jurors and "he does not think like they do." *Id*. at 195. With regard to referencing a frontal lobe problem in reading the poem, Mr. Killam stated that it was simply self-deprecating humor. *Id*. Finally with regard to the reptilian brain comment, Mr. Killam testified that he was not referring to Petitioner as an animal, but that "his brain sometimes functions in a flight or fight mode because he was working out of instinct." *Id*. at 196.

The right to effective assistance of counsel extends to closing arguments. *See Bell v. Cone*, 535 U.S. 685, 701-702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Herring v. New York*, 422 U.S. 853, 865, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975). Trial counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Therefore, judicial review of a defense attorney's summation is "highly deferential-and doubly deferential when it is conducted through the lens of federal habeas." *Yarborough v. Gentry,* 540 U.S. 1, 6, 124 S. Ct. 1, 4, 157 L. Ed. 2d 1 (2003) (per curiam).

In *Yarborough*, the Supreme Court dealt with a claim of ineffective assistance of counsel based on several comments made by defense counsel in his closing argument. The Court noted that the Ninth Circuit Court of Appeals had criticized defense counsel's presentation including his mentioning "'a host of details that hurt his client's position, none of which mattered as a matter of law.'" *Id*. at 9 (citation omitted). The Court stated:

> The Ninth Circuit singled out for censure counsel's argument that the jury must acquit if Gentry was telling the truth, even though he was a "bad person, lousy drug addict, stinking thief, jail bird." *See* 320 F.3d, at 900. It apparently viewed the remark as a gratuitous swipe at Gentry's character. While confessing a client's shortcomings might remind the jury of facts

they otherwise would have forgotten, it might also convince them to put aside facts they would have remembered in any event. This is precisely the sort of calculated risk that lies at the heart of an advocate's discretion. By candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case. See J. Stein, Closing Argument § 204, p. 10 (1992-1996) ("[I]f you make certain concessions showing that you are earnestly in search of the truth, then your comments on matters that are in dispute will be received without the usual apprehension surrounding the remarks of an advocate").

*Yarborough*, 540 U.S. at 9-10. *See Smith v. Spisak*, 130 S. Ct. 676 (2010)(counsel's disparaging comments in penalty phase closing argument portraying client as "sick," "twisted," and "demented" were not sufficient to establish prejudice prong of *Strickland* given nature of the case and counsel's explicit appeal for mercy). *See also Windom v. Sec'y Dep't. of Corrs.*, 578 F.3d 1227, 1251 (11th Cir. 2009)(counsel's candid comments in his penalty phase opening and closing arguments acknowledging brutality of crime and that client was not deserving of pity was not deficient performance when counsel affirmatively argued existence of statutory mitigating circumstances).

The state court held that "[a]lthough counsel could have used different terminology, counsel was not making those statements for the purpose of belittling Lawrence but to express that the evidence elicited from the . . . (PET) scan demonstrated that Lawrence had brain damage and diminished Lawrence's moral culpability, which is an extremely relevant consideration." *Lawrence II*, 969 So.2d at 310. A review of the entire closing argument supports this determination. Mr. Killam's statements during his closing argument were not designed to belittle or humiliate Petitioner, but to try to describe his limited brain functioning. Mr. Killam argued strenuously that Petitioner's crimes should be mitigated by his mental illness and argued that a life sentence was the moral decision for the jury to make. Petitioner has not demonstrated that Mr. Killam was ineffective nor that he was prejudiced by these remarks given the entire context of the closing argument.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut

the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

c.    Voluntariness of statements

Petitioner contends that his counsel should have introduced all of the statements he gave police (only two of six were introduced) to give the jury a complete picture of his ability to remember, his intentions, his actions, and his ability to understand the questions and actions of law enforcement.

1.    State Court Proceedings

The Florida Supreme Court held:

Finally, Lawrence contends that his counsel was ineffective in failing to show the reliability and voluntariness of Lawrence's statements to the police. The postconviction court denied this claim as follows:

> During the evidentiary hearing, Mr. Killam testified that he felt the statements went "hand in hand with the domination mitigator" being proffered at the penalty hearing because the statements blamed the co-defendant Jeremiah Rodgers as the reason/motivation for the crimes. The overall theme to be presented to the jury was the fact that the Defendant was a textbook case of mental illness "accompanied by a satanic domination, a Manson like person." Thus, it would have been contrary to the overall theme to contest the reliability of the statements wherein the statements were used to show "follower" relationship. As such, the Court finds the strategic decisions employed by defense counsels did not render their performance ineffective, thus this claim is denied.

(Citations omitted.) Lawrence contends that the court below interpreted his claim too narrowly and alleges that his counsel should have admitted more

of the statements because they showed a complete picture of Lawrence, including his inability to remember, that he did not shoot the victim in this case and did not shoot the victim in the Smitherman case, and that Lawrence did not kill Livingston.

First, Lawrence never raised below the claim that counsel was ineffective in failing to submit all of the confessions. Instead, at the court below, postconviction counsel asserted that counsel should have presented expert testimony to establish that when he gave his statements to the police, Lawrence did not understand his rights, did not understand the questions, did not understand the consequences of his answers, and was merely trying to please his interrogators, issues which are not raised here. His modified claim is procedurally barred. *See Armstrong v. State*, 862 So.2d 705, 713 (Fla.2003) ("This Court will only review those claims actually presented to the court below and thus will not consider the modified versions of these claims under ineffective assistance analysis."). To the extent that this claim is not procedurally barred, Lawrence has failed to establish any basis for granting relief as to this claim.

*Lawrence II*, 969 So.2d at 310-11.

## 2.    Clearly Established Supreme Court Law

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. §2254(b)(1),[10] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).    To satisfy the exhaustion

---

[10]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
  (A)  the applicant has exhausted the remedies available in the courts of the State; or
  (B) (i)  there is an absence of available State corrective process; or
    (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed.2d 1 (1999); *Picard*, 404 U.S. at 277-78. An issue that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839-40, 848, 119 S.Ct. at 1734; *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999).

This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1, 111 S. Ct. 2546, 2555, 115 L. Ed.2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed.2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Bailey*, 172 F.3d at 1303. In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question. *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed.2d 820 (2002). The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," *Siebert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S. Ct. 850, 858, 112 L. Ed.2d 935 (1991); *Upshaw v.*

*Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

    3.      **Federal Review of Claim**

The Florida Supreme Court held that Petitioner did not raise this subclaim in his motion for postconviction relief and concluded that the claim as modified on appeal was procedurally barred. The state court held that it will review only claims actually presented to the lower court and not modified versions of these claims. Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review. *See Coleman v. Thompson, supra*. Therefore, this subclaim is denied.

**Ground VII: Florida's Death Penalty Scheme Violates *Proffitt v. Florida***

Petitioner contends that Florida's death penalty scheme, which was approved in *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 296, 49 L. Ed. 2d 913 (1976), as applied violates the Constitution. He also alleges ineffective assistance of appellate counsel in failing to make this argument on direct appeal of his case. Doc. 1 at 102-110.

    1.      **State Court Proceedings**

Petitioner raised this issue in the direct appeal of his conviction and sentence. The Florida Supreme Court held as follows:

> The final issue we here consider is the issue of proportionality. In *Bates v. State*, 750 So.2d 6, 12 (Fla.1999), this Court stated:
>
>> Our function in a proportionality review is not to reweigh the mitigating factors against the aggravating factors. As we recognized in our first opinion in this case, that is the function of the trial judge. Rather, the purpose of proportionality review is to consider the totality of the circumstances in a case and compare it with other capital cases. For purposes of proportionality review, we accept the jury's recommendation and the trial judge's weighing of the aggravating and mitigating evidence.
>
> (Citations omitted.) We have likewise said that proportionality "is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a 'thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it

with other capital cases.' " *Beasley v. State*, 774 So.2d 649, 673 (Fla.2000) (quoting *Porter v. State*, 564 So.2d 1060, 1064 (Fla.1990)).

Additionally, we stated in *Dixon v. State*, 283 So.2d 1, 7 (Fla.1973):

> Death is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation. It is proper, therefore, that the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of most serious crimes. In so doing, the Legislature has also recognized the inability of man to predict the myriad tortuous paths which criminality can choose to follow. If such a prediction could be made, the Legislature could have merely programmed a judicial computer with all of the possible aggravating factors and all of the possible mitigating factors included-with ranges of possible impact of each-and provided for the imposition of death under certain circumstances, and for the imposition of a life sentence under other circumstances. However, such a computer could never be fully programmed for every possible situation, and computer justice is, therefore, an impossibility. The Legislature has, instead, provided a system whereby the possible aggravating and mitigating circumstances are defined, but where the weighing process is left to the carefully scrutinized judgment of jurors and judges.

We have followed *Dixon* by stating that the death penalty is "reserved for only the most aggravated and least mitigated of first-degree murders." *Urbin v. State*, 714 So.2d 411, 416 (Fla.1998).

The sentencing order in this case found extensive aggravating circumstances and substantial mitigating circumstances. The trial judge properly weighed these circumstances and determined that the jury's death recommendation should be followed. The trial judge's sentencing order offered the following summary of his findings:

> The Court has carefully considered and weighed the aggravating circumstances found to exist in this case. The State has proven beyond and to the exclusion of every reasonable doubt the existence of two serious aggravators. The prior violent felony aggravator was given great weight due to the fact that both prior offenses were committed prior to the murder of Jennifer Robinson, were committed with the

co-defendant, Rodgers, and involved murder and attempted murder. Both of these prior crimes were senselessly violent and without any moral or legal justification. They are indicative of the same total disregard for human life evidenced in this case. In each case, Lawrence and Rodgers killed or attempted to kill another human being for the sheer excitement or depraved enjoyment of the act. In addition, the cold, calculated, and premeditated aggravator was given great weight due to [Lawrence's] significant involvement in the planning, preparation, and execution of the murder.

In weighing the aggravating factors against the mitigating factors, this Court understands the process is not simply arithmetic. It is not enough to weigh the number of aggravators against the number of mitigators. The process is more qualitative than quantitative. The Court must and did look to the nature and quality of the aggravators and mitigators that it has found to exist.

The Court finds, as did the jury, that these two aggravators greatly outweigh all of the statutory and non-statutory mitigating circumstances, inclusive of the significant mental mitigation.

Sentencing order at 19-20 (citations omitted). In comparing the particular circumstances of the instant case with other cases which have had similar aggravation and mitigation, we determine that Lawrence's death sentence is proportionate.

This Court has upheld sentences of death in several cases involving aggravating and mitigating circumstances similar to those found in the instant case. In *Robinson v. State*, 761 So.2d 269, 272-73 (Fla.1999), this Court reviewed a trial court's imposition of a death sentence on a defendant who had been convicted of murdering an acquaintance in order to obtain money for drugs. The trial court found three aggravating factors: "(1) the murder was committed for pecuniary gain; (2) the murder was committed to avoid arrest; and (3) the murder was cold, calculated and premeditated." *Id*. The trial court found two statutory mitigating factors: "(1) Robinson suffered from extreme emotional distress (some weight); and (2) Robinson's ability to conform his conduct to the requirements of the law was substantially impaired due to history of excessive drug use (great weight)." *Id*. at 273. The trial court also found eighteen nonstatutory mitigators:

(1) Robinson had suffered brain damage to his frontal lobe (given little weight because of insufficient evidence that brain damage caused Robinson's conduct); (2) Robinson was under the influence of cocaine at the time of murder (discounted as duplicative because cocaine abuse was considered in statutory mitigators); (3) Robinson felt remorse (little weight); (4) Robinson believed in God (given little weight); (5) Robinson's father was an alcoholic (given some weight); (6) Robinson's father verbally abused family members (given slight weight); (7) Robinson suffered from personality disorders (given between some and great weight); (8) Robinson was an emotionally disturbed child, who was diagnosed with ADD, placed on high doses of *Ritalin*, and placed in special education classes, changed schools five times in five years, and had difficulty making friends (given considerable weight); (9) Robinson's family had a history of mental health problems (given some weight); (10) Robinson obtained a G.E.D. while in a juvenile facility (given minuscule weight); (11) Robinson was a model inmate (given very little weight); (12) Robinson suffered extreme duress based on fear of returning to prison because where he was previously raped and beaten (given some weight); (13) Robinson confessed to the murder and assisted police (given little weight); (14) Robinson admitted several times to having a drug problem and sought counseling (given no additional weight to that already given for history of drug abuse); (15) the justice system failed to provide requisite intervention (given no additional weight to that already given for history of drug abuse); (16) Robinson successfully completed a sentence and parole in Missouri (given minuscule weight); (17) Robinson had the ability to adjust to prison life (given very little weight); and (18) Robinson had people who loved him (given extremely little weight).

*Id*. This Court upheld Robinson's death sentence because the totality of the circumstances indicated that Robinson was capable of functioning in everyday society and that he "acted according to a deliberate plan and was fully cognizant of his actions." *Id*. at 278.

In *Smithers v. State*, 826 So.2d 916, 931 (Fla.2002), this Court reviewed a trial court's imposition of two death sentences on a defendant who had been convicted of murdering two women and then disposing of their bodies in a pond. The trial court found two aggravating factors for the murder of the first victim: (1) previous violent felony (contemporaneous

murder); and (2) the murder was especially heinous, atrocious, or cruel
(HAC). The trial court found three aggravating factors for the murder of the
second victim: (1) previous violent felony (contemporaneous murder); (2)
HAC; and (3) CCP. This Court detailed the mitigation found by the trial
court which related to both murders:

> The trial court found the following two statutory mitigators:
> (1) the murder was committed while Smithers was under the
> influence of extreme mental or emotional disturbance
> (moderate weight) and (2) Smithers' capacity to appreciate the
> criminality of his conduct or conform his conduct to the
> requirements of the law was substantially impaired (moderate
> weight). The trial court also found the following nonstatutory
> mitigators: (1) Smithers was a good husband and father, (2)
> Smithers enjoyed a close relationship with his siblings, (3)
> Smithers was physically and emotionally abused by his
> mother as a child, (4) Smithers regularly attended church and
> was devoted religiously, (5) since being arrested, Smithers
> has been a model inmate and he would conduct himself
> appropriately in a prison setting, (6) Smithers has made
> several contributions to the community, and (7) Smithers
> confessed to the crime, but his trial testimony is in *455
> conflict with his statements to the detectives. All of the
> nonstatutory mitigators were given moderate weight. Finally,
> the court considered the statements of John Cowan ( [second
> victim's] father), who requested that Smithers be given a life
> sentence. This was given great weight by the trial court.

*Smithers*, 826 So.2d at 931. This Court found both of Smithers' death
sentences proportionate. *Id.*

Additionally, this Court has upheld death sentences in other analogous
cases where extensive aggravating circumstances outweighed substantial
mitigating circumstances. *Cf. Chavez v. State*, 832 So.2d 730 (Fla.2002);
*Zakrzewski v. State*, 717 So.2d 488, 494 (Fla.1998); *Gudinas v. State*, 693
So.2d 953, 968 (Fla.1997); *Rolling v. State*, 695 So.2d 278, 297 (Fla.1997);
*Pope v. State*, 679 So.2d 710, 716 (Fla.1996); *Henyard v. State*, 689 So.2d
239, 255 (Fla.1996); *Branch v. State*, 685 So.2d 1250, 1253 (Fla.1996);
*Spencer v. State*, 691 So.2d 1062, 1065 (Fla.1996); *Provenzano v. State*, 497
So.2d 1177, 1183-84 (Fla.1986).

In the instant case, the trial court found that despite the existence of
mental mitigation, Lawrence was capable of functioning in society, he

could comprehend the consequences of his actions, and he acted with a deliberate plan to further his own gruesome personal interests. Moreover, the jury recommended death by a vote of eleven to one, and the trial court accorded great weight to the two extremely serious aggravating circumstances (prior violent felonies and CCP). The trial court only gave considerable weight to the statutory mental mitigators and explained the factual reasons for their diminished weight in the sentencing order. *See* sentencing order at 10-13. The other statutory and nonstatutory mitigators were accorded similar or less weight. We find that the death sentence in the instant case is proportionate to Robinson, given the trial court's findings that Lawrence's *mental impairments* did not deprive him of self-control and that Lawrence followed a deliberate plan to murder the victim. *Cf. Robinson*, 761 So.2d at 273.

The instant case is also proportionate to *Smithers*, which involved similar facts and similar aggravating and mitigating circumstances. In both the instant case and Smithers, either the HAC or CCP aggravators were found, and both are considered extremely serious aggravators. *See Larkins v. State*, 739 So.2d 90, 95 (Fla.1999) ("[HAC and CCP] are two of the most serious aggravators set out in the statutory sentencing scheme...."). Although the instant case is distinguishable from *Smithers*, in that Lawrence did not actually commit the instant murder,FN11 the prior violent felony aggravator in the instant case is arguably more serious than the same aggravator in *Smithers*, given Lawrence's multiple convictions of murder and principal to attempted first-degree murder, which occurred over a period of months. Therefore, the aggravating circumstances in the instant case are stronger than those found in *Smithers*. Additionally, the trial court in the instant case found that Lawrence's *mental impairments* were diminished by other evidence in this case. Thus, Lawrence's death sentence is proportionate. FN12

FN11. This Court has upheld the death penalty in numerous cases where the defendant did not actually commit the homicide. *See, e.g., DuBoise v. State*, 520 So.2d 260, 266 (Fla.1988).

FN12. The instant case is distinguishable from the cases cited by Lawrence. Lawrence first cites *Huckaby v. State*, 343 So.2d 29, 34 (Fla.1977), in which this Court vacated a death sentence due to substantial mental mitigation. *Huckaby*, however, involved the imposition of the death penalty for a conviction of rape of a child under the age of eleven and is therefore clearly distinguishable. Lawrence also cites to *Hess v. State*, 794 So.2d 1249, 1265 (Fla.2001), where this Court found a death sentence to be

disproportionate for a defendant who suffered from a mental illness. However, the aggravating circumstances in *Hess* were not as significant as the aggravating circumstances in the instant case. *See id.* at 1266 (finding aggravating circumstances of (1) the murder was committed during the course of a robbery; and (2) the defendant was previously convicted of a violent felony (sexual activity with a child and lewd and lascivious assault)). The other cases cited by Lawrence are similarly distinguishable. *Cf. Almeida v. State*, 748 So.2d 922 (Fla.1999) (holding death sentence disproportionate for twenty-year-old defendant who murdered a bar manager where extensive mitigation outweighed single prior violent felony aggravator and jury vote in favor of death was seven to five); *Cooper v. State*, 739 So.2d 82, 86 (Fla.1999) (holding death sentence disproportionate for eighteen-year-old defendant with no prior criminal activity when mitigating circumstances of brain damage, mental retardation, and mental illness outweighed three aggravating circumstances, including CCP, and the jury's vote in favor of death was eight to four); *Fitzpatrick v. State*, 527 So.2d 809, 812 (Fla.1988) (holding death sentence disproportionate where defendant had emotional age between nine and twelve years, and neither CCP nor HAC was found); *Miller v. State*, 373 So.2d 882, 886 (Fla.1979) (vacating death sentence because trial judge improperly considered defendant's mental illness a an aggravating factor).

*Lawrence I*, 846 So.2d at 452-55.

As to the issue of ineffective assistance of appellate counsel, the Florida Supreme Court held as follows in Petitioner's state habeas petition:

In his petition for a writ of habeas corpus, Lawrence raises various challenges to the imposition of death by lethal injection. First, Lawrence claims his appellate counsel rendered ineffective assistance of counsel by failing to present certain arguments as to why his sentence of death was inappropriate. As Lawrence acknowledges, appellate counsel presented substantial proportionality arguments, both in its initial brief, during oral argument, and in a motion for rehearing. This Court reviewed these arguments and denied the claim in a lengthy analysis. *See Lawrence*, 846 So.2d at 452-55. Accordingly, we deny this claim as procedurally barred. *See Zack v. State*, 911 So.2d 1190, 1210 (Fla.2005) (denying a claim as procedurally barred where claim "simply refashions a claim that was unsuccessfully raised on direct appeal"); *Rutherford v. Moore*, 774 So.2d 637, 645 (Fla.2000) (holding that when a claim is actually raised on direct appeal, the Court will not consider a claim that appellate counsel was ineffective for failing to present additional arguments in support of the claim on appeal). Lawrence's other challenges presented in his habeas

petition have been previously denied. *See supra*, note 9. *Lawrence II*, 969 So.2d at 315.

### 2. Clearly Established Supreme Court Law

Petitioner's argument is essentially that his death sentence is disproportionate because his case should have been compared to all cases which were similar, whether a death sentence was obtained or not. He also contends that only cases which have no mitigation should be eligible for death.

Proportionality review of death sentences is not required by the U.S. Constitution. In *Pulley v. Harris*, 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed.2d 29 (1984),the Court declined to hold that the Eighth Amendment required appellate courts to perform proportionality review of death sentences. *Murray v. Giarratano*, 492 U.S. 1, 9, 109 S. Ct. 2765, 2770, 106 L. Ed.2d 1 (1989). *See also, Lewis v. Jeffers*, 497 U.S. 764, 778-79, 110 S. Ct. 3092, 3101-02,111 L. Ed.2d 606 (1990)*(proportionality review is not constitutionally required).

### 3. Federal Review of Claim

Because errors of state law are not cognizable in federal habeas, the issue of whether Petitioner's death sentence is proportional will not be reviewed. *See Bush v. Singletary*, 99 F.3d 373, 375 (11th Cir. 1996)("Proportionality review of the kind at issue is not required by the federal constitution, [citing *Pulley v. Harris*], but only by Florida law. "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley*, 465 U.S. at 41. . . . Florida has conducted the proportionality review its law requires. No federal constitutional claim meeting the requirements of § 2244(b)(2)(B) is presented"). *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385 (1991)("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Citations omitted).[11]

---

[11]Respondents point out that the most relevant case for proportionality review is that of Petitioner's co-defendant, Jeremiah Rodgers. Mr. Rodgers' death sentence was affirmed by the Florida Supreme Court on appeal after a new sentencing proceeding. *See Rodgers v. State,* 3 So.3d 1127, 1133-

As to allegations of ineffective assistance of appellate counsel, the Florida Supreme Court held this claim to be procedurally barred because Petitioner's appellate counsel did present substantial proportionality arguments which were considered and denied. Under state law, the court will not consider a claim that appellate counsel was ineffective for failing to present additional arguments in support of the claim on appeal when a claim is actually raised on direct appeal. Therefore this claim is procedurally barred from habeas review. The claims in ground seven are denied.

Ground VIII:[12]        *Atkins* claim

Petitioner alleges that the Equal Protection Clause requires that *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed.2d 335 (2002), be extended to him as a mentally ill defendant. Doc. 1 at 110-13.

1.        State Court Proceedings

Petitioner raised this issue in his motion for postconviction relief, and the postconviction court denied the claim. The Florida Supreme Court affirmed, holding as follows:

> For the following reasons, we deny the subsequent claims without extended discussion. In issue four, Lawrence contends that under *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed.2d 335 (2002), equal protection requires that his mental illness be treated similarly to those with mental retardation because both conditions result in reduced culpability. We reject his assertion that the Equal Protection Clause requires this Court to extend *Atkins* to the mentally ill. *See, e.g., Lewis v. State*, 279 Ga. 756, 620 S.E.2d 778, 786 (2005) (declining to extend *Atkins* to the mentally ill); *Tigner v. Texas*, 310 U.S. 141, 147, 60 S. Ct. 879, 84 L. Ed. 1124 (1940) (holding equal protection "does not require things which are different in fact or opinion to be treated in law as though they were the same"); *State v. Hancock*, 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059-1060 (2006) (declining to extend *Atkins* to the mentally ill because mental illnesses come in many forms and different illnesses may affect a defendant in different ways and to different degrees, thus creating an ill-defined

---

35 (2009)(wherein the court considered and denied a proportionality claim).

[12]Petitioner cited both this ground and the following one as Ground IX. This ground has been renumbered as Ground VIII for purposes of this review.

category of exemption from the death penalty without regard to the individualized balance between aggravation and mitigation in a specific case).

*Lawrence II*, 969 So.2d at 300 n.9.

2.      **Clearly Established Supreme Court Law**

In *Atkins v. Virginia*, *supra*, the Supreme Court held that executions of mentally retarded criminals were cruel and unusual punishments prohibited by the Eighth Amendment.  The Court also noted that " '[m]ild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70," and that an IQ score between 70 and 75 "is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition," *id*. at 309 n. 5.

3.      **Federal Review of Claim**

The Supreme Court has not held that *Atkins* extends to those with mental illnesses. The Eleventh Circuit recently addressed an equal protection argument similar to Petitioner's and denied it.  In *Carroll v. Sec'y, Dept. of Corrs.*, 574 F.3d 1354, 1370 (11th Cir. 2009), the court held as follows:

> In addition to his mental retardation claims, Carroll maintains he is also exempt from execution because he is mentally ill. He maintains the rationale behind the Supreme Court's decision in *Atkins* applies equally to persons "who are unable to control their conduct due to mental illness." Specifically, he notes mentally ill persons, like the mentally retarded, act with a lesser moral culpability, and this lesser culpability does not merit retribution in the form of the death penalty. Carroll also asserts executing mentally ill persons does not further the goal of deterrence because, like the mentally retarded, the mentally ill cannot process the possibility of execution as a penalty and control their conduct based on that information. Carroll argues the state court's failure to apply *Atkins* to the mentally ill was a violation of his right to equal protection.

> *Atkins* did not explicitly address the suitability of capital punishment within the context of mentally ill individuals. Carroll, however, requests this Court extend *Atkins* to prohibit the execution of the mentally ill. Such an extension would constitute a new rule of constitutional law. *See Spaziano v. Singletary*, 36 F.3d 1028, 1042 (11th Cir.1994) ("Even if the result the habeas petitioner seeks is within the logical compass of a prior Supreme Court decision; even if prior Supreme Court decisions inform, or

even control or govern, the analysis of the claim; it is still a new rule claim unless the rule is actually dictated by pre-existing precedent." (internal citations and quotation marks omitted)). Under AEDPA, however, this Court cannot create new rules of constitutional law within the context of a habeas petition by a state prisoner. *See* 28 U.S.C. § 2254(d)(1) (stating a federal court may not grant habeas relief to a state prisoner unless the adjudication of his claim in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" (emphasis added)). Accordingly, sans a decision from the Supreme Court barring the execution of mentally ill prisoners, we reject Carroll's claim that he is exempt from execution because he is mentally ill.

Furthermore, other circuits which have considered this issue have likewise rejected the proposition that the Eighth Amendment prohibits execution of the mentally ill and have failed to extend *Atkins* to encompass those defendants. *See Shisinday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007); *Baird v. Davis*, 388 F.3d 1110, 1114-15 (7th Cir. 2004). *See also Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005); *Matheny v. State*, 833 N.E.2d 454, 458 (Ind. 2005); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006); *State v. Hancock*, 840 N.E.2d 1032, 1059-60 (Oh. 2006); *Commonwealth v. Baumhammers*, 960 A.2d 59, 96-97 (Penn. 2008). Therefore, the Florida Supreme Court's rejection of Petitioner's equal protection argument here is not contrary to nor an unreasonable application of *Atkins*. Therefore, this claim is denied.

Ground IX: Florida's Lethal Injection Protocols Violate the Eighth Amendment

In his final ground Petitioner alleges that Florida's lethal injection protocols constitute cruel and unusual punishment as prohibited by the Eighth Amendment of the Constitution. Doc. 1 at 114-116.

1.     State Court Proceedings

Petitioner raised this issue in his motion for postconviction relief, and the postconviction court denied the claim. The Florida Supreme Court affirmed, holding as follows:

In his sixth claim, Lawrence asserts that execution by electrocution or lethal injection is cruel or unusual punishment. Based on our decision in *Diaz v. State*, 945 So.2d 1136 (Fla.2006), we affirm the summary denial by

the trial court and deny this claim as presented in his petition for a writ of habeas corpus. However, as a result of Diaz's execution, we recognize that litigation concerning the constitutionality of Florida's lethal injection procedures is ongoing in *Lightbourne v. McCollum*, No. SC06-2391 (Fla. petition filed Dec. 14, 2006). We do not consider those issues here and express no opinion regarding the merits of any subsequent challenge Lawrence may bring related to lethal injection.

*Lawrence II*, 969 So.2d at 300 n.9.

2.      Clearly Established Supreme Court Law

In *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008), the Supreme Court upheld a three-drug lethal injection protocol similar to Florida's as not constituting cruel and unusual punishment under the Eighth Amendment. Furthermore, revisions to Florida's lethal injection protocols provide additional safeguards. *See Baze*, 553 U.S. at 120 (Ginsburg, J., dissenting)(noting that Florida has adopted safeguards for protection not found in Kentucky's protocols by taking measures to assess an inmate's consciousness).

3.      Federal Review of Claim

Petitioner's claim is foreclosed by the Supreme Court's decision in *Baze*. Additionally, the Florida Supreme Court has consistently rejected this type of challenge to its protocols regarding the three-drug method of execution. *See Lightbourne v. McCollum*, 969 So.2d 326, 349-53 (per curiam)(Fla. 2007), cert. denied, 128 S. Ct. 2485, 171 L. Ed. 2d 777 (2008); *Ventura v. State*, 2 So.3d 194, 198-201 (Fla. 2009). These decisions are not contrary to *Baze*. Therefore, Petitioner is not entitled to relief on this claim.

## V. CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2254 11(b).

The court finds no substantial showing of the denial of a constitutional right in this case. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, no certificate of appealability is issued herewith. If either party objects to this denial, that party may file a motion for reconsideration of the denial; however, a motion to reconsider such denial does not extend the time to appeal. § 2254 11(a).

## VI. CONCLUSION

For the foregoing reasons, the petition for issuance of a writ of habeas corpus (doc. 1) is DENIED. Additionally, no certificate of appealability will issue.

DONE and ORDERED this <u>twentieth</u> day of July, 2010.

*s/ Stephan P. Mickle*

**Stephan P. Mickle**
**Chief United States District Judge**

Case No.: 3:08cv69/SPM